(No. 52338.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. CORNELIUS LEWIS, Appellant.

*Opinion filed November 13, 1981.—Rehearing*
*denied January 29, 1982.*

132

136

GOLDENHERSH, C.J., and RYAN, CLARK, and MORAN, JJ., concurring.

SIMON, J., dissenting.

J. Steven Beckett and Glenn A. Stanko, of Reno, O'Byrne & Kepley, of Champaign, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield, and Patrick Walsh, State's Attorney, of Decatur (Melbourne A. Noel, Jr., Susan M. Sherwin, and Neal B. Goodfriend, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE UNDERWOOD delivered the opinion of the court:

Cornelius Lewis (defendant) and his sister, Bernice Lewis, were indicted for armed robbery, aggravated kidnaping, and murder in connection with the December 14, 1978, robbery of the Citizens National Bank in Decatur, during which Donald Bivens, a bank security guard, was shot and killed. Willie Sangster, a Decatur resident, was separately charged with the same crimes. The three defendants requested and obtained a change of venue to Champaign County, where, in a separate jury trial, defendant and his sister were found guilty of the crimes. Defendant was sentenced to death as a result of a jury verdict and has appealed directly to this court. Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603.

The testimony of the principal witnesses was as follows. Jodi Myers testified that, at 6:45 a.m. on the morning of the crime, she noticed two or possibly three persons in a maroon Monte Carlo automobile in the parking lot of

the day-care center where she worked. As she walked near the Monte Carlo, a black man seated in the driver's seat (whom she later identified from a lineup as Maurice Farris) lowered his sun visor.

Mary Comerford testified that, after delivering her child to the same day-care center, she returned to her car, noticing two black persons in a maroon Monte Carlo parked next to her white Mercury automobile. When she entered her car, a black man wearing a ski mask appeared in her back seat and forced her to drive away, eventually taping her eyes and hands and placing her in the trunk of the Mercury.

Kaye Pinkley, a teller at the Citizens National Bank, testified that decedent Bivens normally drove a van with five tellers from the bank's parking garage to an auto-banking facility. Shortly before 8 a.m. on December 14, as decedent was about to start the van in which the tellers were seated, a tall black man pulled the right front door open, leaned his elbows on the witness's legs, ordered the tellers to remain silent, and shot decedent, as the latter apparently reached for his gun. Then the gunman and another robber took three of the tellers' five briefcases containing money for the day and banking paraphernalia, ran to a light-colored Mercury and drove away. Teller Pinkley and two other tellers later identified items recovered from the Macon County landfill as items which had been in their briefcases that morning.

Mr. and Mrs. Joseph Dennis from rural Macon County stated that, while sitting in their car near the Citizens National Bank, they saw two blacks park Mrs. Comerford's Mercury, enter the bank's parking garage, later return to the Mercury, with three black briefcases, and drive off. Gail Thompson, a florist, saw a black man or person dressed as a man, carrying a black briefcase in the vicinity of the parking lot near the bus station, where Norman Goenne, an office worker, saw the driver in a maroon

Monte Carlo, waiting with the engine running, at around 7:45 a.m.

Maurice Farris testified that he and Willie Sangster (who according to the prosecution's theory was the mastermind of the robbery) surveyed the Citizens National Bank and the route to the home of Margaret Morgan, where defendant apparently was staying. On two mornings, Farris observed the tellers' routine. Sangster introduced defendant and his sister (using the names "Denise" and "Mingo") to Farris, who at trial estimated the sister's height as 5 feet 11 inches, defendant's as over 6 feet and his own as 5 feet 8 inches. The Lewises and he discussed plans for the robbery of the bank. Farris was to drive the car, the Lewises were to do the actual robbing, and Sangster was to get $10,000 "off the top" the day after the robbery, apparently for his role in planning. On the morning of December 13, when they had intended to carry out the plan, the Lewises and Farris were unable to steal a car for use in the robbery, but they did observe the tellers' routine and drove along the route to Mrs. Morgan's. The next morning defendant and his sister, with Farris driving, went to the day-care center in the Monte Carlo looking for a car to steal. Maurice lowered his sun visor to avoid being identified. Defendant left the car and concealed himself in the back seat of Mrs. Comerford's Mercury. When she entered the car he forced her to drive away and eventually took control of her car, forcing her to get into the trunk. Defendant's sister then left Farris in the Monte Carlo, which had accompanied the Mercury, and sat on the passenger side of the front seat of the Mercury. Farris drove to a parking lot near the bus station, got some coffee at about 7:40, and waited with the motor running until defendant and his sister rejoined him, carrying one and two briefcases respectively. The Lewises concealed themselves on the floor of the maroon Monte Carlo. On the drive to Mrs. Morgan's, a siren prompted comments by the

sister, and defendant stated, "The guard went for his gun. I had to burn him." Except for the possibility of a perjury prosecution, Farris received total immunity in return for his testimony.

Mrs. Morgan testified that the Lewises had stayed with her beginning on December 12, 1978. On the morning of December 14, at about 8:05 or 8:10 a.m., she observed the defendants with three black briefcases. She asked Bernice Lewis whether Bernice knew that the bank had been robbed, to which Bernice, with defendant present, replied, "Did he die?" Later that morning Mrs. Morgan saw both Lewises counting a large quantity of money on her coffee table, with black briefcases and "blank money orders from the bank and money wrappers" present. Defendant gave Mrs. Morgan a paper sack to take to Willie Sangster at Jelk's Barbership, where he worked. Later that day, Bernice Lewis and Mrs. Morgan went to a deteriorated section of Decatur to dispose of the black briefcases and a garbage bag containing two handguns, money wrappers, and other miscellaneous items. Subsequently Mrs. Morgan and two neighbors moved these things from the garbage cans, where Bernice Lewis and she had put them, to a "dumpster." Mrs. Morgan, Shirley Brummet (a neighbor), and the Lewises drove to the Davenport, Iowa, bus station, where defendant and his sister caught the bus to Des Moines. Mrs. Morgan eventually turned over to the FBI some money which she said included that given her by defendant. Mrs. Morgan testified that she discovered a .357-Magnum handgun, which a ballistics expert indicated could have fired the bullet which killed decedent, under a mattress in the room in which the Lewises had been staying. She stated she observed the gun during a January 25 FBI consent search of the room when the agents lifted the foot of the mattress on the bed. According to her testimony the gun was located near the head of the bed and was not seen by the agents. She did not then mention the gun to them

but later that day took it to a friend's home from which the agents later recovered it at her direction. The agents both testified that only the lower corners of the mattress were lifted and they did not observe the gun. On January 31 Mrs. Morgan did give to FBI agents five live rounds of .357-caliber ammunition which she had earlier removed from the gun.

Barbara Rigney (one of Mrs. Morgan's children) and Florida Eubanks and Shirley Brummet (two neighbors) testified that Bernice and Cornelius Lewis had been staying at Mrs. Morgan's in mid-December, 1978. Wyonia Adams, another neighbor, testified that she and Shirley Brummet had moved garbage bags containing guns and miscellaneous items from a trash can to a "dumpster." Shirley Brummet testified that, on December 14, she had traveled with the Lewises and Mrs. Morgan to the Davenport, Iowa, bus station. Officer McQuaid, of the Decatur police, testified that he observed a black lady carrying a sack into Jelk's Barbershop on the morning of December 14, 1978.

Defendant's brother-in-law, Dwight David, testified that in late December 1978 defendant had asked him to keep a box which contained money. After he heard that defendant had been arrested, David took the money from the box, put it in a bag, and asked a friend, Mrs. Bradford, to hold it for him. He later retrieved it, and gave it, still in the bag, to the FBI, together with the box from which he had taken it. FBI Agent Ryan testified that new $20 bills with serial numbers G21536201A through G21536247A were included in the money turned over by David. Daniel Kinsella, an official of the Federal Reserve Bank, testified that numbers written on the back of a form (Exhibit 80) indicated that $20 notes with serial numbers G21536001A through G21540000A were in a shipment of currency which had been sent to the Citizens National Bank in Decatur.

Lee Jarombeck, an employee of a Minnesota car

dealer, testified that defendant had rented from him the maroon Monte Carlo which had been observed in the daycare lot and eventually recovered from Farris' garage.

Defendant offered no testimony, adopting Bernice Lewis' case, which primarily emphasized Mrs. Comerford's lineup identification of Farris as her kidnapper, and teller King's positive statements to Decatur police officers that the robbers were both male.

Defendant asserts numerous errors, the resolution of which requires reference to the Illinois death penalty statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1). In relevant part it provides:

"Sec. 9—1. Murder—Death Penalties—Exceptions—Separate Hearings—Proof—Findings—Appellate Procedures—Reversals.

\*\*\*

(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:

\* \* \*

6. the murdered individual was killed in the course of another felony if:

(a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and

(b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child; or

\*\*\*

(c) Consideration of factors in Aggravation and Mitigation. The court shall consider, or shall instruct the jury to

consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors may include but need not be limited to those factors set forth in subsection (b). Mitigating factors may include but need not be limited to the following:

1. the defendant has no significant history of prior criminal activity;

2. the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;

3. the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;

4. the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;

5. the defendant was not personally present during commission of the act or acts causing death.

(d) Separate sentencing hearing.

Where requested by the State, the court shall conduct a separate sentencing proceeding to determine the existence of factors set forth in Subsection (b) and to consider any aggravating or mitigating factors as indicated in Subsection (c). The proceeding shall be conducted:

1. before the jury that determined the defendant's guilt; or

2. before a jury impanelled for the purpose of the proceeding if:

A. the defendant was convicted upon a plea of guilty; or

B. the defendant was convicted after a trial before the court sitting without a jury; or

C. the court for good cause shown discharges the jury that determined the defendant's guilt; or

3. before the court alone if the defendant waives a jury for the separate proceeding.

(e) Evidence and Argument.

During the proceeding any information relevant to any of the factors set forth in Subsection (b) may be presented by either the State or the defendant under the rules governing the admission of evidence at criminal trials. Any

information relevant to any additional aggravating factors or any mitigating factors indicated in Subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials. The State and the defendant shall be given fair opportunity to rebut any information received at the hearing.

(f) Proof.

The burden of proof of establishing the existence of any of the factors set forth in Subsection (b) is on the State and shall not be satisfied unless established beyond a reasonable doubt.

(g) Procedure—Jury.

If at the separate sentencing proceeding the jury finds that none of the factors set forth in Subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections. If there is a unanimous finding by the jury that one or more of the factors set forth in Subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

\* \* \*

(i) Appellate Procedure.

The conviction and sentence of death shall be subject to automatic review by the Supreme Court. Such review shall be in accordance with rules promulgated by the Supreme Court."

Defendant argues that this statute violates the eighth and fourteenth amendments to the United States Constitution in that greater consideration—a more "individualized focus"—on the personal characteristics of the defendant and the particular circumstances of the offense are re-

quired. The statute, however, is not restrictive. It provides, "The court *** shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).) It does not limit the factors to be considered in mitigation, which "may include but *need not be limited to*" (emphasis added) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)), the factors outlined in section 9—1(c). Information relevant to those factors is admissible regardless of the rules of evidence in criminal trials. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e); *People v. Gleckler* (1980), 82 Ill. 2d 145, 157; *People v. Carlson* (1980), 79 Ill. 2d 564, 589-90; *People v. Brownell* (1980), 79 Ill. 2d 508, 531-36; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603.) It is entirely clear that this court will require that consideration be given to any mitigating facts in the record of the trial (*People v. Carlson* (1980), 79 Ill. 2d 564, 589-90) as well as any which the defendant offers at the sentencing hearing (*Bell v. Ohio* (1978), 438 U.S. 637, 642, 57 L. Ed. 2d 1010, 1016, 98 S. Ct. 2977, 2980-81 (opinion of Burger, C.J.); *Lockett v. Ohio* (1978), 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 989-90, 98 S. Ct. 2954, 2964-65 (opinion of Burger, C.J.); *People v. Glecker* (1980), 82 Ill. 2d 145).

Defendant argues that the statutory phrase "no significant history of prior criminal activity," which is a mitigating factor suggested in section 9—1(c), is impermissibly vague. Similarly, he urges that the section 9—1(g) reference to mitigating factors "sufficient to preclude the imposition of the death sentence" cannot withstand constitutional scrutiny. While the "no significant history of prior criminal activity" phrase can, perhaps, be construed or applied by courts so as to render it overly broad, there is no reason to assume it will be. Even in the case of an aggravating factor, the Supreme Court has refused to invalidate language

which need not be construed to be vague and overly broad. (*Gregg v. Georgia* (1976), 428 U.S. 153, 200, 49 L. Ed. 2d 859, 890, 96 S. Ct. 2909, 2938 (opinion of Stewart, J.).) Approval was there indicated of the Georgia Supreme Court's characterization of the phrase "substantial history of serious assaultive criminal convictions" as an impermissibly vague aggravating factor (*Gregg v. Georgia* (1976), 428 U.S. 153, 202, 49 L. Ed. 2d 859, 891, 96 S. Ct. 2909, 2939 (opinion of Stewart, J.).) We do not, however, view that holding as indicating any constitutional infirmity in the mitigating factor suggested by section 9—1(c)(1). Our statute does not contain the same degree of uncertainty inherent in the Georgia phrase "serious assaultive criminal convictions." Too, the suggestions of possible mitigating factors in section 9—1(c) serve a purpose different from that of aggravating factors. (See *Jurek v. Texas* (1976), 428 U.S. 262, 271-76, 49 L. Ed. 2d 929, 938-41, 96 S. Ct. 2950, 2956-58 (opinion of Stevens, J.), 428 U.S. 262, 277, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2959 (opinion of White, J.); *Proffitt v. Florida* (1976), 428 U.S. 242, 257-58, 49 L. Ed. 2d 913, 925-26, 96 S. Ct. 2960, 2969 (opinion of Powell, J.); *Gregg v. Georgia* (1976), 428 U.S. 153, 221-22, 49 L. Ed. 2d 859, 901, 96 S. Ct. 2909, 2947 (opinion of White, J.).) Aggravating factors serve as necessary prerequisites without which the death sentence cannot be imposed; they delineate the borderline between those cases in which death is a possible punishment and those in which it cannot be considered; because of their manifest importance, their scope must be somewhat more precisely marked than the suggestions of mitigating factors which the jury may weigh in cases where the death sentence is a possibility. We believe the phrasing of section 9—1(c)(1) is not a constitutionally impermissible basis for calling to the jury's attention the absence of significant criminal convictions. (See *Godfrey v. Georgia* (1980), 446 U.S. 420, 426 n.4, 64 L. Ed. 2d 398, 405 n.4, 100 S. Ct.

1759, 1764 n.4 (opinion of Stewart, J.).) The argument that the words "sufficient to preclude imposition of the death sentence" in section 9—1(g) are impermissibly vague was rejected by this court in *People v. Brownell* (1980), 79 Ill. 2d 508, 531, 534. Also rejected were the contentions that a single statutory mitigating factor always precludes the death penalty and that the appellate review provided by our statute is inadequate (79 Ill. 2d 508, 537-38, 541-44; see *Proffitt v. Florida* (1976), 428 U.S. 242, 257-58, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969 (opinion of Powell, J.); *Gregg v. Georgia* (1976), 428 U.S. 153, 203, 49 L. Ed. 2d 859, 891, 96 S. Ct. 2909, 2939 (opinion of Stewart, J.)). Similarly, this court has held that the discretion vested by our statute in the prosecutor does not violate the doctrine of separation of powers or the due process clause. *People v. Brownell* (1980), 79 Ill. 2d 508, 526-28; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-44; see *Gregg v. Georgia* (1976), 428 U.S. 153, 199, 49 L. Ed. 2d 859, 889, 96 S. Ct. 2909, 2937 (opinion of Stewart, J.).

Defendant also urges that a second *voir dire* examination should routinely be conducted before the sentencing phase of a murder case in which the prosecutor seeks the death penalty. He appears to argue that a jury which has convicted a defendant is likely to be " so prejudiced against him as to have a preconceived notion that the death penalty should be imposed" and that this satisfies the statutory requirement of "good cause" for excusing the convicting jury and impaneling another jury for sentencing purposes. We do not agree. The defendant's theory would transform the statutory requirement of "good cause" into a virtually automatic provision that no jury which had heard the guilt phase could hear the sentencing phase. A system so generally providing a new jury for the sentencing phase would arguably be more vulnerable to constitutional attack since, under the present system, the

same jury can, at the sentencing phase, consider the entire record, allowing a more perceptive and complete analysis of aggravating and mitigating factors, even in cases where no evidence is presented in that phase by the defendant. *People v. Carlson* (1980), 79 Ill. 2d 564, 589-90; see *Jurek v. Texas* (1976), 482 U.S. 262, 271-72, 49 L. Ed. 2d 929, 938, 96 S. Ct. 2950, 2956 (opinion of Stevens, J.).

Defendant does not deny that a *voir dire* examination of this jury was conducted in accordance with *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, but argues that qualifying the jury in compliance with *Witherspoon* rules results in a conviction-prone jury. The Supreme Court recently reversed a death sentence imposed by a jury selected in violation of *Witherspoon,* but let the conviction stand. (*Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521.) Our holdings are to the same effect: qualifying a jury in violation of *Witherspoon* does not affect the validity of the conviction. (*People v. Wright* (1974), 56 Ill. 2d 523, 535; *People v. Clark* (1972), 52 Ill. 2d 374, 392-93; *People v. Brooks* (1972), 51 Ill. 2d 156, 167.) The studies now cited as supporting a contrary result involve very limited numbers and small variations in results. They are not persuasive of the allegation that qualifying a jury in accord with the principles of *Witherspoon* results in a jury biased in favor of conviction, and we adhere to our earlier holdings.

Defendant contends that due process is offended by the fact that a jury verdict indicating the death sentence should be imposed makes mandatory its imposition by the judge. It does not, says defendant, accord with due process to deny a trial judge the right to determine whether that verdict may stand in light of testimony here that decedent Bivens reached for his gun before defendant fired, a factor which defendant says section 9—1(c)(4) declares to be mitigating. Thus, it is argued, the jury mistakenly found no mitigating factor sufficient to preclude the death penalty

existed, and the trial judge should have been free to sentence defendant to a term of imprisonment. We note that the trial judge, while indicating that he believed himself bound to follow the verdict, stated that, were it only a recommendation, he would have no hesitation in following it under the circumstances of this case. We believe, however, that had the legislature intended the mitigating factors specified in section 9—1(c) to preclude death, that intent would have been indicated as clearly as section 9—1(b) indicates that a single aggravating factor can support a death penalty. (See *People v. Brownell* (1980), 79 Ill. 2d 508, 537-38.) It is clear that maintaining a link between death sentences and contemporary community values has been thought desirable (*Gregg v. Georgia* (1976), 428 U.S. 153, 190, 49 L. Ed. 2d 859, 884, 96 S. Ct. 2909, 2933 (opinion of Stewart, J.); see also *Jurek v. Texas* (1976), 428 U.S. 262, 269, 49 L. Ed. 2d 929, 936-37, 96 S. Ct. 2950, 2955 (opinion of Stevens, J.)). That object is best achieved by a mandatory construction vesting a determination as to the propriety of the death penalty in the jury under specified circumstances, as our statute now provides.

There is no merit to the contention that the prosecutor's action in offering to recommend a 60-year sentence if defendant pleaded guilty, and seeking the death penalty when defendant elected to stand trial, penalized defendant for exercising his constitutional right to a jury trial. It is entirely clear that defendant knew death was a possibility when he chose to stand trial. There is here no indication of a purpose to punish defendant for exercising his right to jury trial, as was the case in *People v. Moriarity* (1962), 25 Ill. 2d 565, nor allegations of prosecutorial vindictiveness as in *People v. Walker* (1981), 84 Ill. 2d 512. (See also *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663; *People v. McCutcheon* (1977), 68 Ill. 2d 101; *People v. Morgan* (1974), 59 Ill. 2d 276.)

Unless we are willing to say that a prosecutor may never seek a penalty greater than that offered in plea discussions, defendant's argument here must fail, for his election to stand trial was made with a complete understanding of the hazards. *People v. Walker* (1981), 84 Ill. 2d 512.

Defendant argues that the prosecutor's closing argument in the sentencing phase was inflammatory and prejudicial in that it referred to the failure of a jury in another case to impose the death penalty shortly before the instant crime. It is also urged that the instructions and verdict forms used in that phase were improper. The fact that the record reveals no objection at trial as to either matter precludes these claims. *People v. Carlson* (1980), 79 Ill. 2d 564, 575-78; *People v. Underwood* (1978), 72 Ill. 2d 124, 129; *People v. Skorusa* (1973), 55 Ill. 2d 577, 585.

Even if not precluded, defendant's claims would not require reversal. The prosecutor's remarks, an effort to dramatize his belief in the deterrent effect of the death penalty, were not so inherently prejudicial that no instruction could have corrected the situation, had one been requested. Although reference to his personal experience in the other trial was inappropriate, the prosecutor could properly urge the imposition of death as a deterrent to murder. We do not view addition of the personal experience as influencing the verdict. (*People v. Clark* (1972), 52 Ill. 2d 374, 390; *People v. Nilsson* (1970), 44 Ill. 2d 244, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) Too, defense counsel may have believed an objection would overemphasize what the jury might otherwise believe to be an unreasoned argument.

Section 9—1(g) provides:

"(g) Procedure—Jury.

If at the separate sentencing proceeding the jury finds that none of the factors set forth in Subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections. If there is a unanimous finding by the jury that

one or more of the factors set forth in Subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections." (Ill. Rev. Stat. 1977, ch. 38, par. 9–1(g).)

Defendant urges that reversible error is found in the failure of the court to instruct the jury that if it failed to agree that "there are no mitigating factors sufficient to preclude the imposition of the death sentence" the trial court, pursuant to the final paragraph of section 9–1(g), would impose a sentence of imprisonment. We note initially that there is no indication in this record that defendant either requested that the jury be so instructed or tendered an appropriate instruction.

The jury appears to have experienced little difficulty in deciding that there were no "mitigating factors sufficient to preclude death," returning that verdict in approximately one hour. Too, the judge, at the request of defense counsel, had the jury polled, a process (see *People v. Kellogg* (1979), 77 Ill. 2d 524) which normally reveals any overbearing of one juror by another. The jurors here could not have speculated whether defendant, if not sentenced to death, would go free since the sentencing phase instructions, unlike the guilt phase instructions in *Beck v. Alabama* (1980), 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382, made it clear that the defendant would be imprisoned even if a mitigating factor sufficient to preclude death were found. Similarly it seems likely the jurors would have realized that, since defendant would be imprisoned even if they found mitigating factors

sufficient to preclude the death penalty were present, nothing less severe could result if they could not agree on the absence of those factors. This case, in our judgment, is unlike *Beck*, where ignorance of the effect of a mistrial added pressure to convict and interjected "irrelevant considerations" into the guilt determination process. *Beck v. Alabama* (1980), 447 U.S. 625, 642, 65 L. Ed. 2d 392, 406, 100 S. Ct. 2382, 2392.

Defendant urges that the prosecution failed to prove his guilt beyond a reasonable doubt. This court has stated that it will not disturb the jury's verdict of guilty unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People v. Clark* (1972), 52 Ill. 2d 374, 387; *People v. Sustak* (1958), 15 Ill. 2d 115, 123; *People v. Horton* (1954), 4 Ill. 2d 176.) The United States Supreme Court has stated that the standard for reversing a jury's verdict on the ground of insufficient evidence is identical to the test of whether to submit the prosecution's case to the jury:

> "The prevailing rule has long been that a district judge is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt. *** Obviously a federal appellate court applies no higher a standard [in determining whether the evidence was insufficient to sustain guilt, i.e., whether the prosecution failed to prove guilt beyond a reasonable doubt]; rather, it must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *Burks v. United States* (1978), 437 U.S. 1, 16-17, 57 L. Ed. 2d 1, 13, 98 S. Ct. 2141, 2150.

See also *Glasser v. United States* (1942), 315 U.S. 60,

86 L. Ed. 680, 62 S. Ct. 457.

Defendant posits the theory that defendant and his sister were "set up" by Maurice Farris, Margaret Morgan, and Willie Sangster, among whom a conspiracy had existed to rob the bank, and who actually committed the crimes with which defendant and his sister were charged. Defense counsel cites as supporting this theory the fact that the results of a paraffin test apparently indicated burnt powder residue on Farris' left hand, thus suggesting that he had fired the fatal shot. Farris, however, testified he was right-handed. He testified that he had, when he returned the Lewises to Mrs. Morgan's house after the crime, lifted one of the suitcases out of the back seat of the Monte Carlo to give it to defendant. Farris testified that he was not wearing gloves at the time. Testimony of teller Carnahan indicated that the gunman had worn gloves while firing at Bivens. The fact that Farris was granted immunity from prosecution also demonstrates, according to defendant, his self-interest and supports the conspiracy theory. Under that theory defendant was not in Decatur at the time of the robbery, although the Monte Carlo rented by him was conclusively shown to have been there. Defendant argues that this is explainable if the three conspirators stole the car from defendant while he was visiting his sister in Des Moines and brought it to Decatur, an explanation without support in this record. There is a further difficulty with defendant's present argument that his trial counsel was incompetent in not aggressively seeking to establish Farris as the killer. Farris was a short man, 5 feet 8 inches, whereas the bank tellers agreed the killer was over 6 feet tall. It seems quite improbable that defendant's situation would have been improved by the strategy now suggested.

It is apparent from this record that the reasonable-doubt issue is basically a question of credibility of the witnesses. If the jury believed, as it apparently did, the

testimony of Margaret Morgan and Maurice Farris and other State witnesses, the proof of guilt is overwhelming. Corroboration for much of that testimony is to be found in the testimony of Gail Thompson, Norman Goenne, Shirley Brummet, Wyonia Adams, Florida Eubanks, Barbara Rigney, Lee Jarombek, and Officer McQuaid. There was also the damaging testimony of Dwight David, defendant's brother-in-law, and the testimony of four tellers which indicated that it was a tall robber who had leaned across Kaye Pinkley to shoot decedent. The Farris-Morgan testimony was also corroborated by other evidence. Fingerprints of Bernice and one of the tellers were found on the money defendant gave Dwight David. Serial numbers of some of that money matched numbers of some of the bank's shipment of currency. A .38-caliber handgun, identified by the testimony of a Minnesota gun dealer and other witnesses as having been "pawned" to defendant, was found in the Macon County landfill in the area with decedent's gun and items identified by three of the bank tellers as having been in their briefcases on the morning of the murder. Telephone bills showed calls between Lewis residences in Minneapolis and Des Moines and the Morgan and Sangster-Farris residences in Decatur. An Illinois road-map with defendant's fingerprint on it was found in the maroon Monte Carlo seized in Farris' garage, together with a billfold containing identification of "Denise" Lewis. In our judgment the evidence of guilt, if believed by the jurors, was ample.

Defendant claims that the performance of his trial counsel was so inadequate as to deny him effective assistance of counsel in violation of the sixth and fourteenth amendments to the United States Constitution. This court has often stated the test applied to the performance of appointed counsel:

> "In order to establish incompetency of appointed counsel, the defendant is required to

establish actual incompetence of counsel, as reflected by the manner of carrying out his duties as a trial attorney which results in substantial prejudice without which the outcome would probably have been different." (*People v. Carlson* (1980), 79 Ill. 2d 564, 584-85.)

(See *People v. Greer* (1980), 79 Ill. 2d 103, 120-24; *People v. Hills* (1980), 78 Ill. 2d 500, 505-07; *People v. Morris* (1954), 3 Ill. 2d 437, 449.) Arguments that a different test should be adopted have been rejected. *People v. Greer* (1980), 79 Ill. 2d 103, 121.

Public Defender Scott Diamond of Macon County had originally been appointed to represent both defendant and his sister. Attorney Diamond subsequently sought and was granted leave to withdraw from representing defendant because of his representation that the interests of his clients conflicted. Attorney Mark Jackson was then appointed to represent defendant but later sought and was granted leave to withdraw, and Kenneth Kinser was appointed and represented defendant throughout the trial. Diamond continued to represent defendant's sister, and defendant complains that his attorney merely duplicated much of what his sister's lawyer did. Defendant gives numerous examples of action or inaction by his counsel which he considers as demonstrating incompetence. Many of the matters complained of, including waiver of an opening statement after permission was denied to reserve it until close of the State's case (*People v. Georgev* (1967), 38 Ill. 2d 165, 169, *cert. denied* (1968), 390 U.S. 998, 20 L. Ed. 2d 97, 88 S. Ct. 1202) and brief cross-examination (*People v. Keagle* (1955), 7 Ill. 2d 408, 415, *cert. denied* (1956), 351 U.S. 942, 100 L. Ed. 1468, 76 S. Ct. 842), are matters of trial strategy as to which hindsight frequently indicates a different course might have been preferable (*People v. Keagle* (1955), 7 Ill. 2d 408, 416). Similarly, trial counsel may at times have con-

sidered silence preferable to the emphasis which objections, motions to strike, or instructions to disregard give to otherwise objectionable matters. (*People v. Greer* (1980), 79 Ill. 2d 103; *People v. Newell* (1971), 48 Ill. 2d 382; *People v. Martin* (1970), 44 Ill. 2d 489.) The record here shows several conferences during trial but outside the presence of the jury in which both counsel discussed with the judge and their clients the fact that the clients wanted alibi witnesses called whom counsel believed would not be helpful and witnesses cross-examined whom counsel thought best excused without the reemphasis which cross-examination would give to unfavorable facts. At those conferences it is clear that the trial judge considered both lawyers to be competently representing their clients. Defendant complains that counsel presented no evidence other than that of the codefendant Bernice Lewis. It is clear, however, that counsel had read reports, including reports concerning statements of the possible alibi witnesses. It does not seem to us that duplication of a codefendant's motions, or adoption of a codefendant's arguments, can be said to have prejudiced defendant, when no objection is made to their substance.

Of the numerous instances alleged to demonstrate incompetence, several merit separate treatment. Defendant had several prior convictions, including 1965 and 1966 felonious assaults in New York with a knife and a firearm, a 1966 California conviction for second-degree robbery, and a 1969 Minnesota conviction for bank robbery. There is no showing in the record of the periods of imprisonment or the dates of discharge. Under *People v. Montgomery* (1971), 47 Ill. 2d 510, those convictions were admissible for impeachment purposes if defendant had been discharged from confinement within 10 years. Since defendant had been sentenced to 20 years' imprisonment on the bank robbery, it quite likely would have been held admissible. It is here urged that trial counsel was incompetent

for failure to make an *in limine* motion to preclude use of the convictions if defendant testified. We do not agree, for it is by no means clear that the admissibility of his record was the sole motivating factor preventing defendant from testifying during the guilt-determining phase of the trial. The fact that he did not testify in the sentencing phase, even though the full record had been admitted in those proceedings, would seem to be some indication that there were reasons other than his criminal record for his failure to testify. This fact, coupled with the probability that the motion to exclude would have been denied (*People v. Spates* (1979), 77 Ill. 2d 193; *United States v. Callison* (8th Cir. 1978), 577 F.2d 53, *cert. denied* (1978), 439 U.S. 873, 58 L. Ed. 2d 187, 99 S. Ct. 209; *Bendelow v. United States* (5th Cir. 1969), 418 F.2d 42, *cert. denied* (1970), 400 U.S. 967, 27 L. Ed. 2d 387, 91 S. Ct. 379), militate against a characterization of that conduct as demonstrating incompetence. Counsel is not required to make losing objections in order to provide effective representation. *People v. Johnson* (1970), 45 Ill. 2d 501.

If made, an objection to the judge-conducted *voir dire* would have failed (*People v. Jackson* (1977), 69 Ill. 2d 252), and the fact that counsel did not ask for notation of the race of jurors was not incompetence. Defendant's objection to the *voir dire* examination and jury composition appears to have been an unsupportable demand for a proportionate number of his race on the jury and venire in this case. (*Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824; *People v. Powell* (1973), 53 Ill. 2d 465, 477-78.) It was entirely proper for the judge to omit mention of Bernice Lewis in asking whether jurors could obey their oaths despite the possibility of a death penalty, since there was no possibility of that penalty applying to her.

A number of the leading questions posed to Farris were apparently designed not so much to lead him as to

limit his testimony so as to avoid any hearsay testimony concerning statements by Sangster. Attorney Kinser had objected to such hearsay, and may have tolerated these leading questions rather than take the risk that hearsay would be elicited, since he would then be forced to rely on the jurors' ability to disregard it.

An additional claim of error involves an episode late in the trial when a prosecution witness made reference to a meeting when defendant was "visiting his probation officer." A motion for mistrial was made by Attorney Kinser. The judge indicated he was willing to grant the motion, but that it would likely result in defendant being later tried with Willie Sangster, whose trial originally had been consolidated with that of the Lewises, but then continued to the following month. The judge also indicated that if the defendant desired to withdraw the motion for mistrial, he would admonish or instruct the jury to disregard the improper reference.

It is an overstatement to assert, as defense counsel now does, that the judge placed a "condition" on the grant of mistrial. The judge, in discussions with defendant, made it clear that motions for severance would be considered later if it appeared that a joint trial would prejudice defendant.

Perhaps some attorneys might have pressed the judge to consider severance at the same time as he considered mistrial and might have attempted to obtain a ruling on that issue prior to deciding whether or not to withdraw the motion for mistrial. However, even the defendant's brief acknowledges that a sufficient showing of antagonistic defenses had not been made when the pretrial objections to Sangster's consolidation had been made. Production of additional evidence would have necessitated delay in the trial, and, if severance were denied, a delay would have resulted in the admonition given the jury to disregard the improper reference. Given the circumstances here, we believe counsel cannot be accused of incompetence for

failing to insist that the court rule in a form the judge was not obliged to follow. Nor will we speculate that the court would have erred on a later motion for severance. The effect, if any, of the reference to the probation officer was necessarily limited to the guilt phase of the trial, for defendant's entire criminal record was before the jury during the sentencing phase. As we earlier indicated, the testimony and evidence of defendant's guilt, if believed, was overwhelming, and we do not believe there is any reasonable possibility that the "slip" complained of might have contributed to the conviction. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

Both in the guilt phase and prior to finding an aggravating factor in the sentencing phase, the jury was given modified versions of Illinois Pattern Jury Instructions (IPI), Criminal, Nos. 1.01, 1.03 (1968), which indicated, among other things, that arguments were to be confined to evidence, and were to be disregarded if not confined to evidence and reasonable inferences therefrom. In view of those instructions we consider defendant's complaint of inaccuracies in the prosecutor's argument to be inconsequential. Similarly, the remarks in attorney Diamond's closing argument implying defendant's guilt (*People v. Nilsson* (1970), 44 Ill. 2d 244, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881; *People v. Clark* (1972), 52 Ill. 2d 374) were not "material factors" in the jury's verdict. Counsel appears to have made a tactical judgment as to these arguments, as with the probation-officer "slip" where the judge agreed that some attorneys would think it best to say nothing at all, thus lessening the impact on the jury by not emphasizing the matter. *People v. Carlson* (1980), 79 Ill. 2d 564, 584-85; *People v. Greer* (1980), 79 Ill. 2d 103, 120-24; *People v. Hills* (1980), 78 Ill. 2d 500, 505-07; *People v. Morris* (1954), 3 Ill. 2d 437, 449.

Defendant's appellate counsel also claims that the lack

of communication between defendant and his trial counsel establishes ineffective assistance of counsel. We do not agree. Although on the day of the post-trial motion defendant stated that there never was any "rapport" between him and his counsel and although he had, prior to trial, written the judge a letter requesting different counsel, he appears to have generally communicated with defense counsel adequately during trial. Thus, on May 18, the fourth day of the trial, he stated:

> "DEFENDANT CORNELIUS LEWIS: ***. Mr. Kinser and I have had misunderstandings since we come on the case. But, since the beginning of this trial I don't— I don't think we have had that much— much dissatisfaction with each other.
>
> The first day maybe so, you know. There were a few things that I thought should have been relevant, you know, to the case, you know.
>
> But, this morning, you know, after— after he explained to me the logic behind not asking certain questions, you know, or contesting certain answers, I consented. Didn't I agree that is the route that we should agree with?
>
> MR. KINSER: Yes."

Although he indicated he was not satisfied with the judge's response to his letter, he stated:

> "DEFENDANT CORNELIUS LEWIS: Once I recognized the fact that Mr. Kinser and I were, you know, through this to the end, you know, I just put my mind on trying to work with him."

His differences with his attorney were hardly "irreconcilable," as in *Brown v. Craven* (9th Cir. 1970), 424 F.2d 1166, where the defendant would not speak to his lawyer. On May 22, the next-to-last day of the trial, defendant indicated agreement with counsel concerning whether defendant should testify and indicated they were working together with respect to the possible alibi witnesses. In retrospect, with a verdict of guilty and the death penalty, it can be argued that many things should have been done differently. Viewed in the context of an ongoing trial,

however, the record does not establish incompetence.

Defendant contends that the fact that a motion for substitution of judges was filed March 15, 1979, invalidates (Ill. Rev. Stat. 1977, ch. 38, par. 114–5) Judge Scott's actions that same day (1) allowing Mr. Diamond to withdraw as defendant's counsel, (2) allowing, on March 19, Mr. Jackson (who had been appointed on March 15) to withdraw and (3) appointing, on March 19, Mr. Kinser as defendant's counsel. There is no allegation that Judge Scott purposefully appointed counsel whom he believed was not qualified. Defendant contends, however, that he did not consent to appointment of someone other than the Macon County public defender. Ill. Rev. Stat. 1977, ch. 34, par. 5604.

The docket entry for March 15, 1979, indicates attorney Diamond was allowed to withdraw and attorney Jackson appointed prior to allowance of the motion for substitution of judges. It is undisputed that attorney Jackson's motion to withdraw had to be allowed since his firm represented the robbed bank and had, in fact, advised the bank concerning a reward. (*People v. Stoval* (1968), 40 Ill. 2d 109.) As in *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 504-05, a prompt "administrative act" was required, to insure that time pressures did not interfere with the right of the defendant to a fair trial. The action by Judge Scott was in the nature of "a formal or ministerial" one which in the absence of an allegation of purposeful appointment of unqualified counsel had little or no direct relation to the merits of the case. See *Gieffels v. State* (Alaska 1976), 552 P.2d 661.

A defendant in a criminal case does not, of course, have the right to choose appointed counsel. (*People v. Cox* (1961), 22 Ill. 2d 534, *cert. denied* (1963), 374 U.S. 855, 10 L. Ed. 2d 1076, 83 S. Ct. 1925.) On March 13, after Judge Scott informed defendant that he would appoint the Macon County public defender, the judge

asked whether defendant had any questions, to which he replied:

"Yes sir, the first, of course, will be I will not speak with anyone this court recommends from this county as representative of me."

Having, in effect, rejected both the public defender and private Macon County attorneys, defendant cannot now complain of failure to consent to not being represented by the public defender. See *People v. Lairson* (1971), 131 Ill. App. 2d 612; *People v. Hubbard* (1966), 77 Ill. App. 2d 14.

Defendant contends that the judge should have immediately conducted an evidentiary hearing upon receipt of his letter of April 8, 1978. The judge instead answered the defendant by letter and denied his request. The defendant's letter complained of attorney Kinser's appointment because the latter allegedly "personally knew and associated with the decedent on a social and professional level." Defendant also stated his attorney was not acting in defendant's interest, and requested appointment of a named Champaign County attorney. There was no allegation that attorney Kinser had ever represented decedent, so as to raise the problem addressed in *People v. Stoval* (1968), 40 Ill. 2d 109.

Even though the judge did not conduct an evidentiary hearing prior to answering the letter, there were later occasions when attorney Kinser was discussed by defendant and the trial judge. Nothing appears in the record of those occasions to indicate that there was any substantial factual basis underlying the allegations. Attorney Kinser was under an obligation to inform the court of any substantial potential conflict (*Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173), and neither he nor appellate counsel has called our attention to any facts supporting the allegations.

Considering the case in the context of the entire

record, we conclude that the trial judge was not obliged to hold an evidentiary hearing upon receipt of defendant's letter. See *United States v. Morrissey* (2d Cir. 1972), 461 F.2d 666.

Defendant contends that the court erred in giving certain instructions relating to justification for the use of force and an instruction relating to a permissive inference from possession of recently stolen property. We think it clear that the jurors, who were informed that it was their duty to consider all of the instructions, could not have been misled. The instructions as to force were: "A person is not justified in the use of force if he is committing a forcible felony." "When I use the words 'forcible felony' I mean Armed Robbery." The jury was instructed not to single out individual instructions. The following were also given:

"To sustain the charge of Armed Robbery, the State must prove the following propositions:

First: That the defendant took U.S. Currency from the persons of Donald Bivens, Sr., Teresa Carnahan, Kay Pinkley, Kathy Johnson, Carol Woodcock and Ida King; and

Second: That the defendant did so by the use of force or by threatening the imminent use of force; and

Third: That the defendant was armed with a dangerous weapon.

If you believe from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

Each defendant is presumed to be innocent of the charges against each. This presumption remains with each defendant throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in the case you are convinced

beyond a reasonable doubt that a defendant is guilty.

The State has the burden of proving the guilt of a defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendants are not required to prove their innocence."

The complained-of instructions would not ordinarily be understood by jurors to indicate that defendant was guilty of armed robbery. Rather, they merely eliminate, if the jury did find armed robbery, possible confusion as to the gun-drawing testimony's effect on the murder charge.

The court also gave the following instruction:

"If you find that a defendant had exclusive possession of recently stolen property, and there was not reasonable explanation of that possession, you may infer that a defendant obtained possession of the property by Armed Robbery."

Defendant claims the evidence did not support giving this instruction and that, in any event, it violates the defendant's rights under the fifth and fourteenth amendments to the United States Constitution.

We earlier noted Mrs. Morgan's and Dwight David's testimony relating to two occasions when the defendant had exclusive possession of large quantities of money. Mrs. Morgan testified that she saw defendant and his sister seated in Mrs. Morgan's living room, counting money on the coffee table, with "blank money orders from the bank and money wrappers" as well as black briefcases nearby. It was reasonable for the jury to conclude that this was Citizens National Bank money, with Citizens National Bank money orders and wrappers. The jury could reasonably conclude that this money was stolen, as well as that which Dwight David testified he received from defendant and on which fingerprints of a Citizens National Bank teller were found and the serial numbers of which matched those shipped to the bank.

The instruction was clearly permissive, rather than mandatory. When read together with the rest of the

instructions it is clear that this instruction had the limited purpose of connecting the defendant with an armed robbery independently proved. No rational jury could interpret the words "may be inferred" to indicate that possession alone would prove armed robbery, or that it was an irrebuttable direction or that it shifted the burden of persuasion. *Sandstrom v. Montana* (1979), 442 U.S. 510, 514-15, 61 L. Ed. 2d 39, 45, 99 S. Ct. 2450, 2454.

Even putting this inference aside, the other evidence in this case was sufficient to amount to proof beyond a reasonable doubt of the elements of armed robbery. Thus the inference is tested by the less stringent test of *County Court v. Allen* (1979), 442 U.S. 140, 60 L. Ed. 2d 777, 99 S. Ct. 2213. The inquiry is whether "there is a 'rational connection' between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is 'more likely than not to flow from' the former. (*County Court v. Allen* (1979), 442 U.S. 140, 165, 60 L. Ed. 2d 777, 797, 99 S. Ct. 2213, 2228. See *People v. Housby* (1981), 84 Ill. 2d 415.) We believe the test is satisfied in the present case. There was a "rational connection" between the fact of possession of property recently taken in an armed robbery and the inferred fact of participation in the armed robbery.

Given the evidence in this case, and the basic fact of either the incident testified to by Mrs. Morgan or the incident testified to by Dwight David, the ultimate fact of defendant's participation in the armed robbery was "more likely than not." It cannot be claimed that defendant was merely serving as a "fence," since stolen currency is not ordinarily the subject matter of such sales.

This court has repeatedly acknowledged the emphasis by the Supreme Court upon the qualitative difference between imprisonment and death as penalties, and the necessity to avoid arbitrary or capricious death sentences by adequately defining capital offenses, by directing sentencing discretion, and by providing adequate judicial

review. (*People v. Gleckler* (1980), 82 Ill. 2d 145, 161-62; *People v. Brownell* (1980), 79 Ill. 2d 508, 532-34.) Those cases, when considered together with *People v. Carlson* (1980), 79 Ill. 2d 564, *People v. Greer* (1980), 79 Ill. 2d 103, and *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, effectively demonstrate that we are not insensitive to the responsibilities involved in our review of capital cases and have not hesitated to vacate death penalties where improperly imposed. Our responsibilities, however, neither require nor permit reversal where no reasonable doubt of guilt exists, no reversible error has occurred, and there is no indication that the jury imposed the penalty on other than a reasoned basis.

We accordingly affirm the judgment of the circuit court of Champaign County. The clerk of this court is directed to enter an order fixing Friday, May 14, 1982, as the date on which the original sentence of death entered in the circuit court shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the warden of the Illinois State Penitentiary at Joliet.

*Judgment affirmed.*

CHIEF JUSTICE GOLDENHERSH, concurring:

I joined Mr. Justice Ryan in his dissent in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, and for the reasons therein stated am of the opinion that the death penalty provisions of section 9—1 of the Criminal Code are unconstitutional. Following the decision of *People ex rel. Carey v. Cousins* I have concurred in several opinions pertaining to the application of certain provisions of section 9—1. (*People v. Greer* (1980), 79 Ill. 2d 103; *People v. Brownell* (1980), 79 Ill. 2d 508; *People v. Carlson* (1980), 79 Ill. 2d 564; *People v. Walker* (1981), 84 Ill. 2d 512.) Because it was held that the death penalty could not be imposed in those cases, there was no reason to explain my concurrence in the court's opinions.

It is apparent that the General Assembly and a majority of the electorate of this State desire that the death penalty be available as a sanction in certain types of cases. If this court were the final tribunal to determine the validity of the statute in its present form I would continue to dissent in the hope that ultimately a majority of the court would agree or that the General Assembly might be persuaded to effect the amendments which I consider necessary to render the statute valid. In this situation, however, the Supreme Court can grant *certiorari* and decide the questions on which this court is divided.

Once this court has spoken, I, like any other citizen of Illinois, must acquiesce in its decision. That there be a final decision on the issue is of great importance for the reason that there are now pending before this court 26 cases wherein death penalties have been imposed. It is essential that the question of the validity of the statute be determined. Consequently, with considerable reluctance, under the compulsion of *People ex rel. Carey v. Cousins*, I concur in the opinion affirming the judgment of the circuit court of Champaign County.

JUSTICE RYAN, also concurring:

I concur in the opinion and the judgment of the court in this case. I also join in the concurrences of Mr. Chief Justice Goldenhersh and Mr. Justice Clark, who have expressed precisely my reason for no longer adhering to the rationale of the dissent which I authored in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 544, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 603. Having authored that dissent, which now forms the basis of Mr. Justice Simon's dissent in this case, I feel compelled to add my observations to those made by the chief justice and Mr. Justice Clark.

In considering the question with which the chief justice, Mr. Justice Clark and I are faced, one is compelled to

accept the very fundamental concept that ours is a government of law and not of men. In fact, this court has incorporated that concept in the Standards of Judicial Conduct by providing in our Rule 61(c)(1):

> "A judge should bear in mind that ours is a government of law and not of men and that his duty is the application of general law to particular instances." 73 Ill. 2d R. 61(c)(1).

This court, not seven individual justices, has considered the constitutionality of our death penalty statute and this court found it to be constitutional. Those of us who disagree with that conclusion voiced our dissent. Having done so, it is now our obligation to accept the law as pronounced by this court. This is not to say that the holdings of this court are cast in stone and forever unchangeable. However, nothing has changed since this court's decision in *Cousins* except one member of the court that decided *Cousins* has retired. As Mr. Justice Clark stated in his concurrence, the circumstances which warrant changes in the law do not include changes in personnel of the court. If the law were to change with each change in the makeup of the court, then the concept that ours is a government of law and not of men would be nothing more than a pious cliche.

For this reason, although I authored the dissent in *Cousins*, I concur in the opinion and judgment of the court in this case.

JUSTICE CLARK, also concurring:

I concur in the opinion and judgment of the court. Two years ago I joined in Mr. Justice Ryan's dissent in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 544, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 603. Since then I have participated in and, indeed, have authored opinions in other cases where the death penalty statute was in issue. (See *People v. Walker* (1981), 84 Ill. 2d 512 (plurality opinion); *People v. Gleck-*

*ler* (1980), 82 Ill. 2d 145 (majority opinion); *People v. Carlson* (1980), 79 Ill. 2d 564 (dissenting opinion); *People v. Brownell* (1980), 79 Ill. 2d 508 (majority opinion); *People v. Greer* (1980), 79 Ill. 2d 103 (dissenting in part).) Participation in these cases has given me an invaluable opportunity to consider and reflect upon both the Supreme Court's pronouncements concerning the death penalty and this court's opinion on the subject.

Subsequent to this court's decision and the Supreme Court's denial of *certiorari* in *People ex rel. Carey v. Cousins*, I acquiesced in the majority's view on the issue of the prosecutor's ability to request a death sentence hearing. Indeed, in *People v. Brownell*, where the precise issue decided in *People ex rel. Carey v. Cousins* was again presented, that being a procedural question, namely the method of the submission of the death penalty hearing to the court, and not the question of the constitutional validity of the death sentence *per se*, which issue has been decided by the United States Supreme Court, it was said, in an opinion filed without dissent:

"As to the defendant's other arguments that the prosecutor's discretion to request a sentencing hearing will lead to cruel and unusual punishment and the arbitrary and capricious imposition of the death penalty in violation of the eighth amendment, we believe those issues were addressed and resolved in our recent decision in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531. There we held that the discretion vested in the prosecutor pursuant to section 9—1(d) of the murder statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)) does not offend the eighth amendment because the prosecutor does not act as the sentencing authority. He merely requests a sentencing hearing dependent upon whether the requisite elements for a death sentence exist. Also, we held that the prosecutor's

discretion is sufficiently guided since he will request a sentencing hearing at the conclusion of the trial, after he will have had the opportunity to evaluate evidence to determine whether a sentencing hearing is, indeed, warranted.

The next contention of the defendant—that section 9—1(d) constitutes an improper delegation of legislative authority and an improper grant of judicial sentencing power to the executive branch— was also decided and rejected in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531. We need not consider it again here." (79 Ill. 2d 508, 527-28.)

It is my considered opinion that, having once expressed my disagreement with an opinion of the court and then having followed such opinion in a case which was decided shortly after, it would be inconsistent to reverse my position simply because a new justice has joined this court. I agree with the view expressed by my distinguished colleague in his dissent that the doctrine of *stare decisis* does not mean that the law is immutable and rigid. On the contrary, I am a firm believer in the continuing evolution of our law and of the requirement that it change to meet changing circumstances. I think, however, that the circumstances which warrant changes in the law do not include changes in personnel. Rather, the circumstances I consider significant enough to bring about changes in the law are those which render an existing rule of law impracticable or unjust and which will bring about a sensible and just result. When those circumstances are present, I will vigorously vote to change the law.

I think, however, that a serious mistake would be made if, at this juncture, this court overruled *People ex rel. Carey v. Cousins* and struck down the death penalty statute. An opportunity to strike down the act was passed up two years ago. In the interim, several other opinions

have approved the procedure whereby the prosecutor requests a death sentence hearing. Were we to declare the act void now, those opinions would stand for naught. They were the result of a great deal of deliberation by this court and represent our best efforts to offer lucid instruction on this exceedingly difficult issue. It would be grossly unfair to the citizens of the State and members of the General Assembly that, rather than declare the act unconstitutional when the first opportunity arose in *People ex rel. Carey v. Cousins*, we permitted prosecutors, the General Assembly, the judiciary, and criminal defendants, as well as the citizens of Illinois, to rely on our pronouncement that the act was constitutional. If we were to decide now, four years after passage of the act, and after so many persons sit on death row, that the act is unconstitutional, a great disservice to the stability of the law would be perpetrated by this court. Such a result would indicate that this court does not decide issues based on the law, but based instead on who happens to be sitting on the court at a particular time.

Secondly, striking down the death penalty statute at this point on the ground that the statute violated the State constitutional separation of powers principle would prevent the United States Supreme Court from considering this case or any other capital case arising in Illinois. Thus, the General Assembly would be forced to continue to speculate as to whether any death penalty statute it might devise could pass the scrutiny of the United States Supreme Court.

Finally, I agree with Mr. Justice Traynor's statement that once a judge has dissented, he is obligated to follow the law as pronounced. The respected jurist and scholar wrote:

> "Paradoxically the well-reasoned dissent, aimed at winning the day in the future, enhances the present certainty of the majority opinion, now

imbedded in the concrete of resistance to the published arguments that beat against it. For that very reason the thoughtful dissident does not find it easy to set forth his dissent.

Once he has done so he has had his day. He should yield to the obligation that is upon him to live with the law as it has been stated. He may thereafter properly note that he is concurring under compulsion, abiding the time when he may win over the majority, but he should regard dearly enough the stability of the law that governs all the courts in the state not to renew the rataplan of his dissent. When the trial court properly follows the declared law and is duly affirmed by the intermediate court, he should not vote for a hearing on the basis of his dissent. Conversely, should the trial court be reversed on the basis of his dissent, he should vote for a hearing. When the court has granted a hearing in a case with multiple issues, including the ancient one, and there is a nucleus of dissenters on other issues, he should not cast his vote on the basis solely of his ancient dissent to achieve a reversal or affirmance that would not otherwise have materialized. To do so would only work mischief. The judge's responsibility to keep the law straight is not less when he is a dissenter." Traynor, *Some Open Questions on the Work of State Appellate Courts*, 24 U. Chi. L. Rev. 211, 218-19 (1957).

I would only add that once a judge has expressed a differing view from the majority, and has then acquiesced in the majority view, to the point of writing an opinion which accords the majority's view its rightful place as the controlling law on the matter, due regard for the consistency of this court's opinions leads a judge to continue to follow the majority's view.

JUSTICE MORAN, also concurring:

The dissent of my colleague, Mr. Justice Simon, has raised two issues which he believes render the Illinois death penalty statute unconstitutional. The first issue concerns the failure of the statute to set forth "objective standards guiding the exercise of a prosecutor's discretion to seek the death penalty ***." (88 Ill. 2d at 190.) The other issue relates to the inadequacy of notice to the defendant as to when the prosecutor will seek the death penalty. I disagree with the conclusions reached on both of these issues and feel compelled to respond in the event further review of this case occurs.

It is not every case of murder that a prosecutor may seek the death penalty. He may do so only when one or more of the seven aggravating factors listed under section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)) is present. It is my view that these seven aggravating factors constitute objective standards under which the prosecutor may *seek* the death penalty. It is totally inaccurate to refer to the prosecutor as the one who *imposes* the sentence. It is the sentencing body— judge or jury, as the case may be—that imposes the sentence. The prosecutor only triggers the procedure to be followed and then only when the evidence establishes that one or more of the aggravating factors is present.

The issue of prosecutorial discretion in capital cases has been addressed in the plurality and concurring opinions in *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960, *Jurek v. Texas* (1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950, and the dissent of Mr. Justice White in *Roberts v. Louisiana* (1976), 428 U.S. 325, 337, 49 L. Ed. 2d 974, 984, 96 S. Ct. 3001, 3008 (White, J., Burger, C.J., and Blackmun and Rehnquist, JJ., dissenting).

The plurality opinion of Mr. Justice Stewart in *Gregg*,

joined by Mr. Justice Powell and Mr. Justice Stevens, stated:

"First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, *the decision to impose it had to be guided by standards so that the sentencing authority* would focus on the particularized circumstances of the crime and the defendant." (Emphasis added.) (428 U.S. 153, 199 & n.50, 49 L. Ed. 2d 859, 889 & n.50, 96 S. Ct.

174

2909, 2937 & n.50.)

In the same case, the concurring opinion of Mr. Justice White, joined by the Chief Justice and Mr. Justice Rehnquist, stated:

"Petitioner also argues that decisions made by the prosecutor—either in negotiating a plea to some offense lesser than capital murder or in simply declining to charge capital murder—are standardless and will inexorably result in the wanton and freakish imposition of the penalty condemned by the judgment in *Furman*. I address this point separately because the cases in which no capital offense is charged escape the view of the Georgia Supreme Court and are not considered by it *in determining whether a particular sentence is* excessive or disproportionate.

Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, *the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.* Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to

be standardless any more than the jury's decision to impose life imprisonment on a defendant whose. crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly 'similar.' If the cases really were 'similar' in relevant respects, it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary." (Emphasis added.) 428 U.S. 153, 224-25, 49 L. Ed. 2d 859, 903, 96 S. Ct. 2909, 2949.

The same plurality in *Proffitt* stated:

"The petitioner first argues that arbitrariness is inherent in the Florida criminal justice system because it allows discretion to be exercised at each stage of a criminal proceeding—the prosecutor's decision whether to charge a capital offense in the first place, his decision whether to accept a plea to a lesser offense, the jury's consideration of lesser included offenses, and, after conviction and unsuccessful appeal, the Executive's decision whether to commute a death sentence. As we noted in *Gregg*, this argument is based on a fundamental misinterpretation of *Furman*, and we reject it for the reasons expressed in *Gregg*. See [428 U.S. 153, 199, 49 L. Ed. 2d 859, 889, 96 S. Ct. 2909, 2937.]" (428 U.S. 242, 254, 49 L. Ed. 2d 913, 924, 96 S. Ct. 2960, 2967.)

And the same concurring justices stated:

"Accordingly, the Florida statutory scheme for imposing the death penalty does not run afoul of this Court's holding in *Furman v. Georgia*.

For the reasons set forth in my opinion con-

176

curring in the judgment in *Gregg v. Georgia* [(1976), 428 U.S. 153, 224-25, 49 L. Ed. 2d 859, 902-03, 96 S. Ct. 2909, 2948-49], and my dissenting opinion in *Roberts v. Louisiana* [(1976), 428 U.S. 325, 348-50, 49 L. Ed. 2d 974, 990-91, 96 S. Ct. 3001, 3013-14], this conclusion is not undercut by the possibility that some murders may escape the death penalty solely through exercise of prosecutorial discretion or executive clemency." 428 U.S. 242, 261, 49 L. Ed. 2d 913, 928, 96 S. Ct. 2960, 2970.

Again in *Jurek*, the same plurality stated:

"The petitioner first asserts that arbitrariness still pervades the entire criminal justice system of Texas—from the prosecutor's decision whether to charge a capital offense in the first place and then whether to engage in plea bargaining, through the jury's consideration of lesser included offenses, to the Governor's ultimate power to commute death sentences. This contention fundamentally misinterprets the *Furman* decision, and we reject it for the reasons set out in our opinion today in *Gregg v. Georgia* [(1976), 428 U.S. 153, 199, 49 L. Ed. 2d 859, 889, 96 S. Ct. 2909, 2937]." (428 U.S. 262, 274-75, 49 L. Ed. 2d 929, 940, 96 S. Ct. 2950, 2957.)

And the same concurring justices stated:

"I also cannot agree with petitioner's other major contention that under the new Texas statute and the State's criminal justice system in general, the criminal jury and other law enforcement officers exercise such a range of discretion that the death penalty will be imposed so seldom, so arbitrarily, and so freakishly that the new statute suffers from the infirmities which *Branch v. Texas* found in its predecessor." 428 U.S. 262, 278, 49 L. Ed. 2d

929, 942, 96 S. Ct. 2950, 2959.

While the plurality opinion in *Roberts* did not address the issue of prosecutorial discretion, the dissent of Mr. Justice White, joined by the Chief Justice, Mr. Justice Blackmun and Mr. Justice Rehnquist, did and stated:

"Nor am I convinced that the Louisiana death penalty for first-degree murder is substantially more vulnerable because the prosecutor is vested with discretion as to the selection and filing of charges, by the practice of plea bargaining or by the power of executive clemency. Petitioner argues that these characteristics of the criminal justice system in Louisiana, combined with the discretion arguably left to the jury as discussed above, insure that the death penalty will be as seldom and arbitrarily applied as it was under the predecessor status. The Louisiana statutes, however, define the elements of first-degree murder, and I cannot accept the assertion that state prosecutors will systematically fail to file first-degree murder charges when the evidence warrants it or to seek convictions for first-degree murder on less than adequate evidence. Of course, someone *must* exercise discretion and judgment as to what charges are to be filed and against whom; but this essential process is nothing more than the rational enforcement of the State's criminal law and the sensible operation of the criminal justice system. The discretion with which Louisiana's prosecutors are invested and which appears to be no more than normal, furnishes no basis for inferring that capital crimes will be prosecuted so arbitrarily and infrequently that the present death penalty statute is invalid under *Furman v. Georgia.*

I have much the same reaction to plea bargaining and executive clemency. A prosecutor may

seek or accept pleas to lesser offenses where he is not confident of his first-degree murder case, but this is merely the proper exercise of the prosecutor's discretion as I have already discussed. So too, as illustrated by this case and the North Carolina case, *Woodson v. North Carolina, ante* [(1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978], some defendants who otherwise would have been tried for first-degree murder, convicted, and sentenced to death are permitted to plead to lesser offenses because they are willing to testify against their codefendants. This is a grisly trade, but it is not irrational; for it is aimed at insuring the successful conclusion of a first-degree murder case against one or more other defendants. Whatever else the practice may be, it is neither inexplicable, freakish, nor violative of the Eighth Amendment. Nor has it been condemned by this Court under other provisions of the Constitution. *Santobello v. New York* [(1971), 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495]; *North Carolina v. Alford* [(1970), 400 U.S. 25, 27 L. Ed. 2d 162, 91 S. Ct. 160]; *Parker v. North Carolina* [(1970), 397 U.S. 790, 25 L. Ed. 2d 785, 90 S. Ct. 1458]; *Brady v. United States* [(1970), 397 U.S. 742, 25 L. Ed. 2d 747, 90 S. Ct. 1463.] See also *Chaffin v. Stynchcombe* [(1973), 412 U.S. 17, 30-31, 36 L. Ed. 2d 714, 725-26, 93 S. Ct. 1977, 1984.] " 428 U.S. 325, 348-49, 49 L. Ed. 2d 974, 990-91, 96 S. Ct. 3001, 3013.

While I have overindulged in quoting excerpts from the above opinions, my point is that seven of the justices have addressed a similar issue to that raised in the dissent. Each of the seven justices found the issue to be without merit.

The remaining issue relates to the adequacy of notice

to the defendant that the prosecutor intends to seek the death penalty. Mr. Justice Simon concludes "[t]hat 'notice' comes only on the morning the jury is selected." (88 Ill. 2d at 192.) I disagree. Notice to the defendant originates when the indictment is presented to him at the time of his arraignment. (See sections 113—1 and 113—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, pars. 113—1, 113—4).) For the prosecutor to seek the death penalty, the indictment, or one of the counts thereof, must charge one or more of the seven aggravating factors listed in section 9—1(b). This places the defendant on notice that the prosecutor intends to seek the death penalty. After an appraisal of the evidence introduced at trial, the fact that the prosecutor decides not to seek such penalty does not invalidate the statute. To quote from *Gregg*, "Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution." 428 U.S. 153, 199, 49 L. Ed. 2d 859, 889, 96 S. Ct. 2909, 2937.

I concur in the judgment of affirmance.

JUSTICE SIMON, dissenting:

The precise issue raised here—whether the Illinois death penalty statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1 *et seq.*) violates the separation of powers provisions of the Illinois Constitution of 1970 (Ill. Const. 1970, art. II, sec. 1)—was presented to this court in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531. A majority of the justices who served on the court at that time concluded that the statute was not unconstitutional. But three of the judges who continue to sit on this court expressed the opposite view. Their reasoning and the added observations set forth below lead me to the same conclusion. The fact that these three judges do not now join in the views I express here should not, in my judgment, deter me from stating my opinion in this case either because I was not a

member of this court when oral argument took place in this case or because of the principle of *stare decisis.*

To avoid a deadlocked court and at the urging of my fellow justices, I have already participated in one capital case argued before I took my place on the court. (*People v. Walker* (1981), 84 Ill. 2d 512.) If I refrain from participating in this case, the infirmities I find in the statute would not disappear. The same problem would be presented again in the next case in which the death penalty was adjudged. In the meantime the fate of Cornelius Lewis might be affected. The Governor's decision if Lewis seeks clemency or the consideration which might be given this case by Federal courts could be colored by what appears to be the Illinois Supreme Court's sanguine acceptance of the constitutionality of the death penalty statute. In fact, a deep rift exists among the justices. The false appearance would, of course, eventually be exposed, for in the next capital case raising the issue it would be my obligation to participate. I would then file the same opinion I do here, but no one can predict what might happen to Cornelius Lewis in the meantime.

It would be blatant folly for this court to acquiesce in the execution of Cornelius Lewis without disclosing that four of the judges comprising the present court, either now or in the past two years, have viewed the death penalty statute as unconstitutional. How much confidence can any member of the judiciary, any State official or any member of the General Assembly have that this statute will continue to be viewed as constitutional?

I agree that the law should be stable; ideally it should not shift with each change of personnel on a reviewing court. This is particularly true of principles of common law, constitutional interpretation or statutory application, especially when those principles have been adhered to for a long time. The concept of *stare decisis* is an accepted and appropriate legal tool. It is especially useful in many as-

pects of civil law. Lawyers relying on *stare decisis* are able to inform their clients with some degree of confidence how factual situations are likely to be decided on the basis of existing precedent. Where issues are close there is value in sacrificing individual views to the interests of uniformity, consistency and predictability.

But capital punishment is an area unsuited to that kind of analysis. (See, generally Douglas, *Stare Decisis*, 49 Colum. L. Rev. 735, 736-37 (1949).) In considering the death penalty's constitutionality we are not dealing with an area in which the practicing bar requires predictability. What lawyer advises his client to commit murder on the ground that the death penalty is unconstitutional? Conversely, what lawyer advises his clients not to commit murder solely on the ground that it is not?

In addition, a firm foundation for the constitutionality of the death penalty has not yet been established. The past decade has seen but one involuntary execution in the entire country (and none in Illinois) as the courts have wrestled with the validity of various types of death penalty statutes. Two Illinois statutes have been struck down, one on Federal grounds (*Moore v. Illinois* (1972), 408 U.S. 786, 800, 33 L. Ed. 2d 706, 716, 92 S. Ct. 2562, 2570), another on State grounds (*People ex rel. Rice v. Cunningham* (1975), 61 Ill. 2d 353). The present statute has been the subject of litigation in this court for only two years, and a glance at our docket reveals a wealth of issues yet to be decided. The time has not yet come when the issue can be considered completely settled.

Most importantly, because of the nature of the death penalty I do not believe that any judge should be expected to stifle his own viewpoint in the interest of uniformity. To follow the dictates of *stare decisis* in a case like this is to allow the conclusions of the past to be stamped indelibly upon the law without opportunity for correction. As the late Mr. Justice Douglas put it, "It is, I think, a

healthy practice (too infrequently followed), for a court to reexamine its own doctrine." (Douglas, *Stare Decisis*, 49 Colum. L. Rev. 735, 746 (1949).) "[T]he mere fact that an error has been committed is no reason or even apology for repeating it, much less perpetuating it." (*Hart v. Burnett* (1860), 15 Cal. 530, 600.) We have recently said: "The tenets of *stare decisis* cannot be so rigid as to incapacitate a court in its duty to develop the law. *** Clearly, the need for stability in law must not be allowed *** to veil the injustice resulting from a doctrine in need of reevaluation." (*Alvis v. Ribar* (1981), 85 Ill. 2d 1, 24.)

Recently and prior to *Alvis*, in *People v. Banks* (1979), 75 Ill. 2d 383, 392, this court expressly overruled *People v. White* (1977), 67 Ill. 2d 107, which it had decided two years earlier. In fact, this court has often overruled precedent. See *Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.* (1979), 78 Ill. 2d 56, overruling *Illinois Central R.R. Co. v. Seitz* (1905), 214 Ill. 350; *People v. Harris* (1978), 72 Ill. 2d 16, overruling *People v. Muir* (1977), 67 Ill. 2d 86; *Hanley v. Kusper* (1975), 61 Ill. 2d 452, 463, overruling in part *Lake Shore Auto Parts Co. v. Korzen* (1973), 54 Ill. 2d 237; *People v. Gregory* (1974), 59 Ill. 2d 111, overruling *People ex rel. Ledford v. Brantley* (1970), 46 Ill. 2d 419; *People v. McNeil* (1972), 53 Ill. 2d 187, overruling *People v. De Filippis* (1966), 34 Ill. 2d 129; *Pulliam v. Industrial Com.* (1969), 43 Ill. 2d 364, overruling *Hochspeier, Inc. v. Industrial Board* (1917), 278 Ill. 523; *Thorpe v. Mahin* (1969), 43 Ill. 2d 36, overruling a line of cases, including *Friedrich v. Wright* (1944), 386 Ill. 229; *Lorton v. Brown County Community Unit School District No. 1* (1966), 35 Ill. 2d 362, overruling *Erford v. City of Peoria* (1907), 229 Ill. 546; *McDaniel v. Bullard* (1966), 34 Ill. 2d 487, overruling *Wilcox v. Bierd* (1928), 330 Ill. 571; *Republic Steel Corp. v. Industrial Com.* (1964), 30 Ill. 2d 311, overruling *Village of Glencoe v. Industrial Com.* (1933), 354 Ill. 190.

When the passage of time brings new judges to the

bench, the doctrine of *stare decisis* does not obstruct a change from precedent, even though the identical question has recently been decided. Recent Illinois examples are: The seating of three new judges between 1970 and 1973 resulted in the decision in *People v. Nunn* (1973), 55 Ill. 2d 344, a criminal case, which overruled *People v. Koshiol* (1970), 45 Ill. 2d 573, decided three years earlier without dissent. The swing vote in *Nunn* was provided by a justice who participated in *Koshiol* without noting any dissent. Similarly, the question of comparative negligence addressed in *Alvis* had been settled, with the opposite conclusion, in *Maki v. Frelk* (1968), 40 Ill. 2d 193. But five of the seven justices who participated in *Alvis* had not participated in *Maki*. They were able to bring their fresh perspective to bear on the case, while the two justices left from the *Maki* court remained consistent in their views of the law. As a result, the *Alvis* majority reached a conclusion different from the *Maki* majority. If the same thing happened here, a new majority, different from that in *Cousins*, would be formed. The stakes are too high in a capital case to affirm a sentence merely for the sake of decisional stability when a newly seated judge of the highest reviewing court disagrees with some of his colleagues.

Justice Roger Traynor of California spoke nearly 25 years ago of the duties of a reviewing court judge in words which should be considered here. He thought that, once a dissent is registered, the dissenter should join the rest of the court in subsequent cases presenting the same issue "abiding the time when he may win over the majority." (Traynor, *Some Open Questions on the Work of State Appellate Courts*, 24 U. Chi. L. Rev. 211, 219 (1957).) Should a new member of the court also stifle his views and silently join the rest of the court, never revealing his understanding of the question? Mr. Justice Traynor does not say, but I infer from his words that he would think not:

"Something is lost to the judicial process if judges

fail to exert full responsibility for their decisions. Such responsibility imposes its own discipline. As they analyze issues that have been disputed every inch of the way, they learn to guard against premature judgment. Entrusted with decisions, bound to hurt one litigant or the other, they come to understand the court's responsibility in terms not of power but of obligation. The danger is not that they will exceed their power, but that they will fall short of their obligation." 24 U. Chi. L. Rev. 211, 224 (1957).

Eight years after publishing that article, Justice Traynor noted an earlier admonition of Judge Jerome Frank:

" '[I]n criminal actions, where life or liberty is at stake, courts should not adhere to precedents unjust to the accused. It is never too late to mend.' " (*People v. Aranda* (1965), 63 Cal. 2d 518, 530, 407 P.2d 265, 272, 47 Cal. Rptr. 353, 360, quoting *United States v. Delli Paoli* (2d Cir. 1956), 229 F.2d 319, 323 (Frank, J., dissenting).)

Judge Frank also had occasion to discuss the strictures of *stare decisis* in *United States ex rel. Fong Foo v. Shaughnessy* (2d Cir. 1955), 234 F.2d 715, 718, where he said:

"For stare decisis should not govern in a case like this where a man's life is involved. Noteworthy here is Rex v. Taylor (1950) 2 K.B. 368, 371, where the English Court of Criminal Appeals overruled its own recent decision in Rex v. Turner, (1939) 1 All E.R. 330. The Court, after noting that the Court of Appeals in civil suits feels bound by its own earlier decisions as precedents in 'order to preserve the rule of stare decisis,' went on to say, 'This court, however, has to deal with questions involving the liberty of the subject,' and therefore felt free to overrule an unfortunate decision which favored the prosecution. Surely that should be the attitude of our courts which are much less bound by their own precedents than

English courts have been traditionally."

Over 100 years ago this court observed:

> "[C]ases will sometimes occur in the decision of the most enlightened judges where the settled rules and reasons of the law have been departed from, and, in such cases, it becomes the duty of the court, before the error has been sanctioned by repeated decisions, to embrace the first opportunity to pronounce the law as it is. A solitary decision of recent date has never been held to change the law in any case; and especially should it not have that effect, where to adhere to it would be fraught with far greater public injustice than could possibly arise from overruling it in the particular case." *Frank v. Darst* (1853), 14 Ill. 304, 310.

So we are faced with the strange spectacle of this court still adhering to the *Cousins* decision although a majority of its judges have stated that it does not represent the correct conclusion. Whether this court acknowledges it, the *Cousins* dissent set forth the proper statement of the law. I believe that, with this dissent, I am upholding the law and pointing out the error that was made in *Cousins*. If the three judges who dissented in *Cousins* were joining me now, a new majority would be formed and the Illinois death penalty statute would be held unconstitutional. This clearly visible paradox cannot be camouflaged by the often quoted but academic assertion that this is a government of law and not of men. Upholding the death penalty statute, with the standardless and unguided discretion granted to the 102 prosecutors who each hold the death penalty in their hands, is what makes for a government of men instead of law.

The Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1 *et seq.*) violates the system of separated powers set up by the Illinois Constitution of 1970. The constitution provides that no branch of government may

exercise powers entrusted to another (Ill. Const. 1970, art. II, sec. 1), but the death penalty statute injects the prosecutor into the exclusively judicial province of sentencing.

The statute provides that in a murder prosecution the court, "where requested by the State," shall conduct a sentencing hearing to determine if the death penalty should be imposed. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d).) The prosecutor has the sole, unlimited discretion to call for a death penalty hearing; that decision is the *sine qua non* of the death penalty. The statute places the first round of decision in the hands of the prosecutor. Is that constitutional?

For a discussion of the basis for the holding that it is not, the dissent in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 544-61, cannot be surpassed. I wholeheartedly endorse its reasoning and adopt it as part of this dissent. It is incorporated as an appendix hereto. See also Note, *The Prosecutor's Discretionary Power to Initiate the Death Sentencing Hearing—People ex rel. Carey v. Cousins,* 29 DePaul L. Rev. 1097 (1980).) The imposition of a criminal sentence is a judicial function, to be exercised within the range of penalties authorized by the legislature. To allow a prosecutor a veto in each case in which the legislature has said that death may be imposed as a penalty is to curtail the power and function of the judicial branch. This violates the principle of separation of powers.

Let me add these thoughts. First, the constitutional convention considered the imposition of criminal sentences to be a purely judicial function. In debates over whether judges should be required to state upon the record the reasons for imposing the criminal sentence they chose, the delegates made it clear that they had in mind a pattern of criminal sentencing: The legislature picks a range of possible penalties, and the judge, after considering the particulars of the crime and the record of the defendant, chooses a sentence within that range. (See 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1381

(hereinafter cited as Proceedings).) There was no room for the prosecutor in that pattern.

The pattern comports with the requirements of due process under the Federal Constitution. The eighth and fourteenth amendments do not allow the arbitrary or capricious imposition of the death penalty—like cases cannot be treated differently. (*Furman v. Georgia* (1972), 408 U.S. 238, 309-10, 33 L. Ed. 2d 346, 390, 92 S. Ct. 2726, 2762 (Stewart, J., concurring); *People v. Gleckler* (1980), 82 Ill. 2d 145, 171.) There must be clear factors guiding and justifying the decision to impose capital punishment, and these factors must be plainly stated in advance by statute. (*Gregg v. Georgia* (1976), 428 U.S. 153, 206, 49 L. Ed. 2d 859, 893, 96 S. Ct. 2909, 2940 (opinion of Stewart, J., joined by Powell and Stevens, JJ.); 428 U.S. 153, 222, 49 L. Ed. 2d 859, 901-02, 96 S. Ct. 2909, 2947-48 (White, J., concurring).) In keeping with this requirement, the Illinois statute sets out a number of aggravating factors. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b).) Yet, at the same time, death, like any other sentence, cannot be imposed rigidly in all cases—different cases cannot be treated alike. (*Roberts v. Louisiana* (1976), 428 U.S. 325, 333, 49 L. Ed. 2d 974, 981-82, 96 S. Ct. 3001, 3006 (opinion of Stewart, J., joined by Powell and Stevens, JJ.).) Thus, the sentencer must consider whatever mitigating factors the defendant might present to allay the imposition of the maximum penalty. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (opinion of Stewart, J., joined by Powell and Stevens, JJ.); *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 989-90, 98 S. Ct. 2954, 2964-65 (opinion of Burger, C.J., joined by Stewart, Powell and Stevens, JJ.).) In keeping with this requirement, the Illinois statute sets out a number of mitigating factors to be considered. Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).

The procedures set forth for the death penalty are

more explicit than those for other criminal sentences, and that is not surprising, given the nature of the punishment. Except for the veto given to the prosecutor, the procedures are similar to those in sentencing in the more ordinary criminal cases. The procedure is always the same in convictions for theft, burglary, battery, possession of drugs, robbery, conspiracy, solicitation, kidnaping, or attempted murder. The legislature sets forth a range of penalties, and, after hearing evidence in aggravation and mitigation, the judge chooses an appropriate sentence for the individual defendant.

The normal sentencing procedures are the same regardless of the rationale behind the sentence. Whether the motivation is rehabilitation (as section 11 of the Illinois bill of rights (Ill. Const. 1970, art. I, sec. 11) provides) or something else, under the Code of Criminal Procedure of 1963 the sentence appropriate to the crime and the criminal is always determined in the same way. And nowhere in these procedures, aside from presenting the evidence in aggravation, is the prosecutor given authority over what sentence shall be imposed for a specific crime. Even in plea bargaining, where the defendant agrees to plead guilty upon the recommendation of a certain sentence from the prosecutor, the judge is not bound by the prosecutor's agreement. (73 Ill. 2d R. 402(d).) When it comes to sentencing, the discretion lies solely in the judiciary.

The infirmity of the death penalty statute is that it puts the prosecutor in a place where he has no business. The harshness of capital punishment is no excuse for relaxing the normal pattern of sentencing. Would there be any question that a statute would be unconstitutional if it allowed the prosecutor, on his own and with no standards to guide his judgment, to seek, say, Class X punishment for some burglaries instead of the usual Class 2 penalties?

This is not the first time the legislature has tried to create special procedures for capital punishment. A prior statute was struck down when it too abandoned the nor-

mal sentencing procedures and created a streamlined three-judge court to impose the death penalty. (*People ex rel. Rice v. Cunningham* (1975), 61 Ill. 2d 353.) If the legislature wishes to enact a death penalty for certain crimes, it must do so within the normal strictures of the State and Federal constitutions.

Second, the *Cousins* majority cited a string of cases (*People v. Bombacino* (1972), 51 Ill. 2d 17; *People v. Handley* (1972), 51 Ill. 2d 229; *People v. Sprinkle* (1974), 56 Ill. 2d 257) as examples of discretion granted to the prosecutor without violating the separation of powers doctrine. These cases held that the prosecutor was properly given the discretion to decide whether a juvenile could be prosecuted as an adult. (56 Ill. 2d 257, 261.) But what the majority did not mention was that this line of cases was abandoned in *People v. Rahn* (1974), 59 Ill. 2d 302. Rather than perpetuating the mistaken notion that the prosecutor could unilaterally make a judicial decision, the court in *Rahn* wisely reinterpreted section 2—7 of the Juvenile Court Act in effect at the time (Ill. Rev. Stat. 1971, ch. 37, par. 702—7) to hold that the final decision was the court's. Under *Rahn*, it was clear that the statute never gave the prosecutor the authority the majority in *Cousins* relied upon. *Rahn* held that the legislature's intention was that the ultimate determination be a judicial one. (59 Ill. 2d 302, 304-05.) Thus, the *Cousins* holding that the prosecutor may be given a veto over the sentencing decision stands bereft of any viable authority to support it.

Third, the State argues that the discretion afforded to the prosecutor is acceptable; that in reality it is no different than the discretion granted to the prosecutor when deciding initially whether to prosecute at all. The State claims that since nothing hinders a prosecutor from declining to prosecute, thus eliminating the possibility of the death penalty, nothing should hinder the much more limited decision to prosecute but without the possibility of the death sentence. The State asks: If a prosecutor can

decide to prosecute without invading the judiciary's province, cannot a prosecutor decide whether to seek a death penalty hearing without invading the judiciary's province?

The most persuasive answer to the question is set forth in the *Cousins* dissent—the Federal Constitution prohibits standardless exercises of discretion, and no standards are provided in the statute for the decision to seek the death penalty. Without standards, the prosecutor's decision to seek a death sentence hearing could be motivated by legally improper considerations. For example, in *People v. Walker* (1981), 84 Ill. 2d 512, a divided majority reversed a death penalty imposed after a defendant first withdrew his negotiated guilty plea (for which he had received 60 years' imprisonment), then entered an unnegotiated plea of guilty. Mr. Justice Ryan's concurring opinion expressed the view that the State's Attorney's vacillation over what was the appropriate penalty for the defendant's offenses violated the eighth and fourteenth amendments' requirement that any decision to impose the death penalty be, and appear to be, based on reason rather than caprice, emotion or mistake. See also *Gardner v. Florida* (1977), 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197.

The plurality opinion in *Walker,* written by Mr. Justice Clark, argued that due process requires that, in death cases where the prosecutor's change of mind results in a different sentence without any material change of facts, the State must show objective facts to justify the change of mind and thus dispel the appearance of vindictiveness. What is so obvious that it hardly needs pointing out is that neither problem would ever arise if there were objective standards guiding the exercise of a prosecutor's discretion to seek the death penalty, standards to which the State's Attorney's decision to seek death could be compared to see if the decision was a product of caprice, emotion, mistake or vindictiveness. Even if the present arrangement comported with the Illinois constitutional doctrine of separation of powers, the lack of standards to guide the prose-

cutor's discretion would be fatal to the statute.

A further answer to the State's argument that the discretion afforded the prosecutor here is no different than the unlimited discretion given the prosecutor to initiate prosecutions is that the argument is based upon a faulty premise. The discretion given the prosecutor to commence a prosecution is *not* unbridled but is sharply limited by the State Constitution. The grand jury and the preliminary judicial hearing to determine probable cause are established by section 7 of the Illinois bill of rights (Ill. Const. 1970, art. I, sec. 7). They are provided by section 7 for the purpose of guiding and channeling the prosecutor's decision to prosecute.

The debates of the constitutional convention made it quite clear that the requirements of section 7 were regarded as checks on the decision to prosecute. As Delegate Weisberg said of the preliminary hearing:

> [T]he two basic characteristics are that the decision of whether or not to commence a prosecution is made by the prosecutor. It is his responsibility, and there is, I believe invariably coupled with that, a requirement that a court make a preliminary determination that there is some fair basis for that decision to make the defendant stand trial. (3 Proceedings 1437.)

While the check exercised by the judge finding probable cause to proceed in a preliminary hearing was clear, some delegates doubted whether the grand jury could effectively review the decision to prosecute. A common figure bandied about in discussion was that 95% of the cases presented to a grand jury by the State's Attorney resulted in prosecution. Some thought the grand jury was a rubber stamp. To this Delegate Borek replied, on the basis of personal experience upon a grand jury, "We deliberated on there as strongly as we did here and really attempted to find whether this person had reason to be indicted or not." In the case of that grand jury, 41 of the 385 prosecutions that were sought by the State's Attorney were denied. (3 Proceedings 1440.) Delegate Hutmacher pointed out that

even if the 95% figure were correct that still meant that in 5% of the cases the grand jury was protecting persons from groundless prosecution. 3 Proceedings 1448.

Delegate Arthur Lennon summarized the rationale behind sections 7 and 8 of the Illinois bill of rights:

> "Before a man stands trial out in the open, before a jury, should there be anything given to him which would give him a little protection to make sure that he isn't indiscriminately tried? And I think it's fair to say that all members of the committee felt that that is a valuable safeguard ***." 3 Proceedings 1441.

Thus, in the area of commencing prosecutions, the prosecutor does not act with unbridled discretion. No prosecution can go ahead on the whim of the prosecutor. Similarly, no death penalty hearing should depend solely on the whim of the prosecutor, as the statute now provides.

The unbridled discretion given to the State's Attorney by the current statute encourages unequal application of the death penalty. The 102 counties in Illinois potentially present 102 different death penalty policies. Executions cannot depend on geography. There can be but one death penalty policy in this State, the one properly adopted by the legislature. Only one branch may properly impose it—the judiciary.

Finally, I am concerned by the inadequacy of notice to the defendant the death statute provides. I agree, as pointed out by the dissenting justices in *Cousins*, that the greater number of peremptory challenges allowed a defendant in a capital case is an uncertain and unsatisfactory indicator of whether the death penalty will be sought. But beyond that deficiency, even the "notice" the defendant receives when the prosecutor announces that the peremptory challenges for a capital case should be allowed is not enough. That "notice" comes only on the morning the jury is selected. Although the indictment may hint that the defendant is eligible for the death penalty, he is not actu-

ally faced with that prospect until the prosecutor actively seeks that penalty. Significant decisions must be made before that time. How can a defendant decide between a guilty plea or a trial; or, if a trial, between a bench trial and a jury trial, without knowing the stakes of a conviction? The current death penalty statute denies defendants the information needed to make the intelligent choices necessary for an effective defense.

I dissent from the sentence commanding the death of Cornelius Lewis. I would reverse that sentence and remand the cause to the circuit court for resentencing.

APPENDIX
TO
DISSENTING OPINION
OF
JUSTICE SIMON

544     People ex rel. Carey v. Cousins     77 Ill. 2d 531

❀ ❀ ❀

MR. JUSTICE RYAN, dissenting:

I have no argument with the concept of prosecutorial discretion as discussed in the majority opinion, and I do not quarrel with the cases cited therein in support thereof. However, in the statute under consideration, the prose-

cutor's discretion is injected into the sentencing stage of the proceedings, which, as indicated later, has consistently been held to be a judicial function. Furthermore, this is a stage of the proceedings which, as indicated in the cases cited below, the Supreme Court has not permitted the arbitrary exercise of discretion. In my opinion, the statute contains no guidelines to prevent the arbitrary exercise of discretion by the State's Attorney, which I perceive to constitute an eighth amendment violation. The Florida, Georgia and Texas statutes discussed in this dissent did not place in the prosecutor the discretion to determine whether or not a death penalty hearing should be held. I therefore find the quotations in the majority opinion from *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, which discusses prosecutorial discretion at other than the sentencing stage, to be of little help. I will discuss the eighth amendment issue later in this dissent.

The crucial part of section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)) provides:

> "*Where requested by the State,* the court shall conduct a separate sentencing proceeding to determine the existence of factors set forth in subsection (b) and to consider any aggravating or mitigating factors as indicated in Subsection (c). ***" (Emphasis added.)

It is contended in this court by the respondent Brown that the vesting in the prosecutor of the discretion to conduct or not to conduct a sentencing hearing to determine if the death penalty shall be imposed confers upon the prosecutor the power to exercise a judicial function. This, it is argued, constitutes a violation of section 1 of article II of the Illinois Constitution of 1970, which provides:

> "THE POWERS OF THE STATE
> Section 1. SEPARATION OF POWERS
> The legislative, executive and judicial branches are

separate. No branch shall exercise powers properly belonging to another."

Article VI, section 1, of the Illinois Constitution of 1970 provides:

"Section 1. COURTS
The judicial power is vested in a Supreme Court, an Appellate Court and Circuit Courts."

I agree with this contention and would hold that section 9—1(d), which confers upon the prosecutor the discretion to determine whether or not a sentencing hearing shall be held, violates article II, section 1, of the Illinois Constitution of 1970. The respondent judge should not, for this reason, be compelled to conduct a sentencing hearing under section 9—1(d) of the Criminal Code of 1961.

The Illinois statute creates a bifurcated procedure in which guilt and sentence are determined in separate proceedings. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a) through (h).) The defendant is first tried under an indictment for murder. If he is found guilty, then the State *may* request the court to conduct a death penalty hearing before the judge or jury. If the sentencing authority finds beyond a reasonable doubt that any one of seven aggravating factors exists, then it must unanimously find that there are no mitigating factors "sufficient to preclude" capital punishment in order to impose the death sentence. If the determination is made by a jury, it is binding on the judge. Once imposed, the sentence is automatically reviewable in this court. Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i).

Under the Illinois statute, the prosecutor is given unlimited discretion in determining whether a sentencing hearing should be conducted. There is no authority in the statute for the court to call for such a hearing, and there is no provision in the statute making such a hearing mandatory under any given set of facts. In addition, under the language of the statute the court has no authority to

decline the State's request for such a hearing.

The State has argued, and the majority finds, that a pretrial exercise of prosecutorial discretion in determining whether to prosecute for a particular crime based upon statutory definitions is no different than the post-conviction decision by the State determining whether or not a penalty hearing should be conducted. The majority opinion, in support of its position, relies heavily on previous decisions of this court involving the exercise of prosecutorial discretion in deciding whether a juvenile should be prosecuted as an adult or as a juvenile offender. I have no quarrel with those cases. The discretion considered there was exercised at a stage of the proceedings traditionally considered not to be reserved as a judicial function. This distinction was noted in *People v. Phillips* (1977), 66 Ill. 2d 412, which is also cited in the majority opinion. It is perfectly proper for the prosecutor to exercise discretion prior to the stage of the proceeding designated as a judicial function.

The power to define the conduct which constitutes a criminal offense and to fix the punishment for such conduct is vested in the legislature. (*People v. Williams* (1977), 66 Ill. 2d 179, 186; *People ex rel. Kubala v. Kinney* (1962), 25 Ill. 2d 491, 492-93; *People v. Burnett* (1946), 394 Ill. 420, 425.) However, the imposition of the sentence within the limits prescribed by the legislature is purely a judicial function. *People v. Montana* (1942), 380 Ill. 596, 608; see also *State v. Leonardis* (1977), 73 N.J. 360, 370, 375 A.2d 607, 612; *State v. Leggeadrini* (1977), 75 N.J. 150, 158-59, 380 A.2d 1112, 1116; *State v. Spinks* (1975), 66 N.J. 568, 575, 334 A.2d 23, 26; *Jackson v. United States* (D.N.J. 1971), 338 F. Supp. 7, 15; 5 Callaghan's Illinois Criminal Procedure sec. 38.20 (1971).

In *People v. Montana,* a 1941 amendment to the parole act (Ill. Rev. Stat. 1941, ch. 38, par. 801 *et seq.*), allowing the Division of Corrections to set the actual

sentence for a defendant after a judge's recommendation, was ruled invalid as an improper delegation of judicial power. In *People v. Phillips* (1977), 66 Ill. 2d 412, section 8(e) of the Dangerous Drug Abuse Act (Ill. Rev. Stat. 1973, ch. 91½, par. 120.8(e)) was challenged as constituting an infringement on the judicial power to sentence. The Act provided that a person on probation and charged with another crime could not be diverted into a drug-treatment program without the consent of his probation officer. This court held that "the authority granted to the probation officer to deny treatment under the Act to persons charged with, *but not convicted of,* a criminal offense does not infringe upon the court's constitutional right to impose sentence." (Emphasis added.) *(People v. Phillips* (1977), 66 Ill. 2d 412, 415-16.) Although the majority cites *Phillips* in support of its position, that case does not condone the exercise of prosecutorial discretion at the sentencing stage, but in fact recognizes that it is the court's constitutional right and duty to impose sentence, free from interference by the prosecutor. In *People ex rel. Martin v. Mallary* (1902), 195 Ill. 582, the court held that the General Assembly could not confer on the executive branch of the State government the authority to send to the penitentiary for a breach of discipline persons who had been committed to a reformatory. "We are of the opinion that such power is denied to the General Assembly by more than one provision of the constitution. The power so attempted to be conferred is judicial, and not executive or administrative." *(People ex rel. Martin v. Mallary* (1902), 195 Ill. 582, 593. See also *People ex rel. Johnson v. Murphy* (1913), 257 Ill. 564, 566; *People ex rel. Fullenwider v. Jenkins* (1926), 322 Ill. 33, 38; *Featherstone v. People* (1901), 194 Ill. 325, 334.) In *People v. Weeks* (1976), 37 Ill. App. 3d 41, it was contended that the court abused its discretion in failing to accept a guilty plea, "that in so doing the court exceeded its function in plea bargaining by

substituting its discretion for that of the State's Attorney. The law is clear in Illinois that sentencing is a judicial function, and it remains so in plea negotiations. Any agreements in plea negotiations are at most recommendations and the sentence to be imposed is for the court and the court alone." *People v. Weeks* (1976), 37 Ill. App. 3d 41, 44.

Clearly, the imposition of a criminal sentence is a judicial function. The legislature may authorize the court to exercise broad discretion in the imposition of sentences by providing for the fixing of sentences within prescribed minimum and maximum years. Or the legislature may restrict the exercise of judicial discretion in sentencing, such as by providing for mandatory sentences. However, once the legislature has prescribed the punishment for a particular offense it cannot condition the imposition of the sentence by the court upon the prior approval of the prosecutor. Section 5—5—3 of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—5—3) provides the various sentences that may be imposed upon a person convicted of an offense. Death is one of the sentences provided if a person is convicted of murder. If the legislature may condition the imposition of the death penalty upon the prior approval of the prosecutor, then the legislature could condition the imposition of any of the dispositions authorized by the statute upon the prior consent of the prosecutor. The majority opinion states: "At most the role of the State's Attorney under section 9—1 could be characterized as requiring his consent before the court may proceed with the procedure for death sentencing." (77 Ill. 2d at 539.) This, of course, means that the judicial function of imposing the death sentence cannot be carried out unless the State's Attorney permits a sentencing hearing to be conducted. If the legislature can so condition the performance of this judicial function, it could also provide that, "where requested by the State, the

court shall conduct a hearing to determine whether or not a defendant may be sentenced to probation." Such an undesirable restriction could conceivably be imposed by the legislature in response to the indignation expressed by the media at an unpopular decision of a court in granting probation in a particular case. The possibility of such a curtailment of the courts' powers could severely hamper the performance of the judicial function in a manner mandated by article VI, section 1, of our constitution.

The separation of powers limitation on a prosecutor's exercise of a judicial function is illustrated by three recent decisions of the California Supreme Court. In that State, by reason of its constitutional history, the California Supreme Court held:

> "When the decision to prosecute has been made, the process which leads to acquittal or to sentencing is fundamentally judicial in nature." (*People v. Tenorio* (1970), 3 Cal. 3d 89, 94, 473 P.2d 993, 996, 89 Cal. Rptr. 249, 252.)

The court, in *Tenorio*, held that a statutory provision denying a judge the right to dismiss certain charges under the Health and Safety Code without prior approval of the prosecutor constituted an attempt to vest in the prosecutor the power to foreclose the exercise of an admittedly judicial power by an appropriate judicial officer. *People v. Tenorio* (1970), 3 Cal. 3d 89, 94, 473 P.2d 993, 996, 89 Cal. Rptr. 249, 252.

In *Esteybar v. Municipal Court* (1971), 5 Cal. 3d 119, 485 P.2d 1140, 95 Cal. Rptr. 524, the Supreme Court of California again stated:

> "Since a prosecutor may not be vested with authority to foreclose the exercise of a judicial power, we have concluded that requiring his consent to determine that an offense is a misdemeanor violates the doctrine of separation of powers \*\*\*." (*Esteybar v. Municipal Court*

(1971), 5 Cal. 3d 119, 122, 485 P.2d 1140, 1141, 95 Cal. Rptr. 524, 525.)

Article III, section 1 (now section 3), of the California Constitution, in language similar to that of article II, section 1, of the Illinois Constitution of 1970, provided:

> "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

The California court held in *Esteybar* that the exercise of the judicial function cannot be conditioned upon approval of either the executive or the legislative branches of government. In *Esteybar,* as in our case, it was contended by the State that the prosecutor's discretion under attack was but an extension of the prosecutorial discretion exercised in determining what crime is to be charged or if any crime is to be charged. The court stated that the argument *overlooks the fact that the court's determination follows* the district attorney's decision to prosecute. Citing *Tenorio,* the court quoted the language quoted above that the process which leads to acquittal or sentencing is fundamentally judicial in nature.

*People v. Superior Court* (1974), 11 Cal. 3d 59, 520 P.2d 405, 113 Cal. Rptr. 21, involved the validity of a statute similar to that considered by this court in *Phillips.* That statute gave to the district attorney the power to veto a decision of the trial judge to order a defendant who was charged with a narcotic offense to be diverted into a pretrial treatment program. The Supreme Court of California, relying on *Esteybar* and *Tenorio,* held that the disposition of the charge was a judicial function and the statute violated the separation of powers provision of the California Constitution.

The three California cases cited demonstrate that wherever the line between executive and judicial functions may be drawn, it is constitutionally impermissible for

the legislature to authorize the prosecutor to exercise a judicial function or to interfere with or foreclose the proper exercise of a judicial power. We need not in this case decide at what point the prosecutorial function ceases and the judicial function commences. Wherever that may be, the previous decisions of this court have established that the imposition of a sentence, following determination of guilt, is purely a judicial function. Any attempt by the legislature to confer upon the prosecutor authority to exercise any part of the sentencing function or the authority to limit, interfere with, or to condition the exercise of the judicial function upon a request by the prosecutor is a violation of the doctrine of separation of powers as contained in article II, section 1, of the Illinois Constitution of 1970.

As noted early in this dissent, I also consider that vesting the unlimited discretion in the prosecutor to request the court to conduct a death penalty hearing constitutes a violation of the eighth amendment to the Federal Constitution.

*Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, rendered invalid most State death penalty statutes. Prior to *Furman,* the Supreme Court had not intimated that discretion in sentencing offended the Constitution. In that case, two justices (Brennan and Marshall) concluded that the eighth amendment prohibited the imposition of the death penalty. Three justices were unwilling to hold the death penalty *per se* unconstitutional. However, they voted to hold the statute invalid, concluding that discretionary sentencing, unguided by legislatively defined standards, violated the eighth amendment. They found that such unguided discretion permitted the death penalty to be imposed wantonly and freakishly. The variety of opinions supporting the judgment in *Furman* caused confusion as to what was required in order to impose the death penalty in accord with the eighth

amendment. (See *Lockett v. Ohio* (1978), 438 U.S. 586, 599, 57 L. Ed. 2d 973, 986, 98 S. Ct. 2954, 2962.) Nonetheless, many States reenacted death penalty statutes containing what they perceived to be the necessary procedural safeguards against the freakish and discriminatory imposition of the penalty. In this State our legislature responded by enacting a death penalty statute (Ill. Rev. Stat. 1973, ch. 38, par. 1005–8–1A), which this court held invalid as violating both our State Constitution and the Federal Constitution. *People ex rel. Rice v. Cunningham* (1975), 61 Ill. 2d 353.

In *Lockett v. Ohio,* Mr. Chief Justice Burger, after summarizing the holdings of the opinions in *Furman,* commented on the post-*Furman* decisions, noting that the court had considered the eighth amendment issues posed by five of the post-*Furman* death penalty statutes. (*Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909; *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960; *Jurek v. Texas* (1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950; *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001.) A majority of the court in the first three of the cited cases found the statutes to be valid, while a majority of the court found that the provisions of the statutes in the last two cited cases did not comply with eighth amendment requirements. In these cases, four justices took the position that all five of the statutes complied with the Constitution. Two justices, as in *Furman,* held that the death penalty *per se* violated the eighth amendment. The disposition of each of the five cases varied according to the votes of a plurality of three justices who delivered a joint opinion in each case upholding the constitutionality of the statutes of Georgia, Florida and Texas and holding the statutes in North Carolina and Louisiana invalid. Thus, the Chief Justice, in

his opinion in *Lockett v. Ohio,* looked to the reasoning of the opinions filed by the plurality in these five cases. Noting that "[t]he signals from this Court have not, however, always been easy to decipher" (*Lockett v. Ohio* (1978), 438 U.S. 586, 602, 57 L. Ed. 2d 973, 988, 98 S. Ct. 2954, 2963), he attempted to reconcile previously differing views in order to give the States the clearest guidance that the court could provide.

The *Lockett* opinion distilled from the nest of cases the idea that there is a qualitative difference between the death penalty and punishment in noncapital cases. Although legislatures remain free to decide how much discretion should be reposed in a judge or jury in noncapital cases, "[w]e are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 989, 98 S. Ct. 2954, 2964.

Death is different from other punishments, not in degree, but it is, in fact, a different kind of punishment. The action of the State in taking the life of one of its citizens differs dramatically from any other form of legitimate State action. From the point of view of the defendant, the penalty is different in both its finality and its severity. It is therefore of vital importance that any decision to impose the death penalty be, and appear to be, based on reason rather than caprice or emotion. (*Gardner v. Florida* (1977), 430 U.S. 349, 357-58, 51 L. Ed. 2d 393, 401-02, 97 S. Ct. 1197, 1204.) This drastic difference has caused the Supreme Court to conclude that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment [citation], requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina* (1976), 428

U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.

In considering the plurality opinions in the five post-*Furman* cases cited above, it can be concluded that the death penalty is not *per se* violative of the eighth amendment, but the procedures outlined in the statutes for the imposition of the penalty may be such as to permit such an arbitrary imposition of the penalty that the statute is rendered invalid as violative of eighth amendment rights. The cases reasoned that, to comply with *Furman,* sentencing procedures should not create a substantial risk that the death penalty will be inflicted in an arbitrary or capricious manner. In the plurality's view, *Furman* does not require that all sentencing discretion be eliminated but only that it be directed and limited so that the death penalty would be imposed in a more consistent and rational manner, and so that there would be a meaningful basis for distinguishing the cases in which it is imposed from those in which it is not. (See *Lockett v. Ohio* (1978), 438 U.S. 586, 600-01, 57 L. Ed. 2d 973, 987-88, 98 S. Ct. 2954, 2963.) In light of the unique and drastic nature of the death penalty this court must carefully scrutinize the discretionary authority vested in the prosecutor by the provisions of section 9—1(d) of the Criminal Code of 1961, which provides:

> "Where requested by the State, the court shall conduct a separate sentencing proceeding ***." Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).

It should be noted that in the statutes of Georgia, Florida and Texas, approved by the Supreme Court in the cases cited above, no discretion was vested in the prosecutor as to whether or not a hearing would be held to determine if the death penalty should be imposed. The statutes provided for such a hearing in the event of conviction of specified felonies. Under our statute a sentencing hearing is neither required after certain convic-

tions, nor is the prosecutor directed as to when to seek the death penalty. The prosecutor has unlimited discretion, unaided by legislatively created directives, in the performance of this indispensable part of the sentencing function. This would appear to be clearly contrary to *Furman* and its progeny. The majority opinion in our case states that a similar argument was rejected in *Gregg v. Georgia,* noting that the opinions of that case, joined in by Mr. Justices Stewart, Powell, Stevens, White, Rehnquist, and the Chief Justice, "express the view that the requirements imposed upon a sentencing body are not applicable to decisions by the prosecutor." (77 Ill. 2d at 540.) Any such expression in *Gregg v. Georgia* has no application here, because under the statute in that case the prosecutor did not participate in the sentencing function. I maintain that if a death sentence can only be imposed if a sentencing hearing has been requested by the prosecutor, the exercise by him of discretion in requesting or not requesting such a hearing can lead to the arbitrary and freakish application of the penalty which was condemned by the Supreme Court. The exercise of this discretion by the prosecutor must therefore be governed by the requirements imposed upon the sentencing body by the Supreme Court.

Although the majority opinion seems to find adequate guidelines to direct the exercise of the discretion of the State's Attorney, it does not specify where these are found or what they are. The opinion simply states: "Unless the State's Attorney believes that there will be testimony which will persuade the jury that the requisite elements for a death sentence exist, he is unlikely to request a hearing." (77 Ill. 2d at 543.) With this statement I cannot agree. The statute contains both aggravating factors, in section 9–1(b), and mitigating factors, in section 9–1(c). At no place does the statute state that these factors are for the guidance of the prosecutor. In the statute these factors are specifically stated to be for the consideration of the court

and jury in determining whether the death penalty should be imposed. It is obvious that they were not intended to be for the guidance of the prosecutor because some of the mitigating factors of section 9—1(c) may not become known until the penalty hearing has been held. It may be true that some prosecutors, in making the decision whether or not to request a sentencing hearing, will consider both the offense and the offender, to the extent that such information is available. It is much more likely, however, that if any of the factors are considered, the prosecutor will consider only the aggravating factors of section 9—1(b), and that no consideration will be given to the individual offender in making the decision. In non-capital cases individualizing the penalty rests on sound sentencing policy and does not assume constitutional dimensions. However, because of the qualitative difference of the death penalty, the eighth amendment *requires* not only consideration of the offense, but also of the offender—"consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) The prosecutor, in requesting the sentencing hearing, is necessarily involved in the sentencing function; that is, the process of inflicting the penalty of death.

In appraising the effect of the prosecutor's discretion, it must be remembered that the statute confers this discretion not upon one individual, but upon the State's Attorney in each of the 102 counties in this State. In view of the absence of statutory directives to the prosecutor, each State's Attorney is free to establish his own policy as to when sentencing hearings will be requested. Some prosecutors may look to sections 9—1(b) and 9—1(c) for guidance. Others may consider some of the listed factors controlling and disregard the remaining, while others may

totally ignore these sections. Such unguided discretion will inevitably lead to an arbitrary and capricious application of the death penalty similar to that condemned in *Furman*. There can be no doubt that under this statute some offenders will be chosen as candidates for the death penalty by one prosecutor, while other offenders with similar qualifications will be spared, not as a result of mercy, but because of the uneven application of the law due to the lack of statutory direction to the prosecutor. There will inevitably be cases where there will be no reasonable basis for the distinction between one on whom the penalty of death is imposed and another who is passed over. (See *Lockett v. Ohio* (1978), 438 U.S. 586, 600-01, 57 L. Ed. 2d 973, 987-88, 98 S. Ct. 2954, 2963.) There will be no reasonable explanation for the distinction between the two convicted offenders except that, because of the personal belief or office policy of one State's Attorney, one offender was chosen as a candidate for the penalty of death, whereas for similar reasons personal to another prosecutor, an equally culpable offender was spared.

The risk of arbitrary and capricious action under section 9—1(d) is most vividly demonstrated by the case of People v. Greer, Docket No. 51214, which was only recently argued before this court. In that case the prosecutor requested the penalty hearing, and the death penalty was imposed upon the defendant. At oral argument before this court, the Attorney General confessed error and stated that this is not a case in which the death penalty should be imposed. Furthermore, this court was informed in oral argument that the State's Attorney who had prosecuted the case is no longer in office and that his successor agrees with the Attorney General. Greer's case clearly shows that because of the lack of adequate guidelines the decision to request or not to request a penalty hearing will, to a great degree, depend upon the whim of the individual prosecutor. Without legislatively

enacted guidelines, the differences in prosecutors, though they be sincere in their beliefs, will inevitably lead to arbitrary and capricious action. Fortunately, this court is in a position to correct an unauthorized imposition of the death penalty. However, the statute may well be rendered arbitrary and capricious in its application by the fact that many prosecutors, in the exercise of unguided discretion, will not request a penalty hearing, whereas other prosecutors, faced with the same set of facts, will request such a hearing, and the death penalty may be imposed.

In *Gregg v. Georgia,* Mr. Justice Stewart stated:

"Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under *sentencing procedures that created a substantial risk* that it would be inflicted in an arbitrary and capricious manner ***.

***

*Furman* mandates that *where discretion is afforded a sentencing body* on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited *so as to minimize* the risk of wholly arbitrary and capricious action." (Emphasis added.) (*Gregg v. Georgia* (1976), 428 U.S. 153, 188-89, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932.)

Our statute contains no directions or guidelines to minimize the risk of wholly arbitrary and capricious action by the prosecutor in either requesting a sentencing hearing or in not requesting a sentencing hearing. The vague belief of the majority that the State's Attorney will not request such a hearing unless he believes that there will be evidence which will persuade a jury that the requisite elements for a death sentence exist is meaningless. Such belief, although the prosecutor may be sincere, will not "minimize the risk of wholly arbitrary and capricious action" unless the

exercise of discretion by the prosecutor is aided, directed and limited by guidelines prescribed by the legislature.

There are other infirmities in the statute which I consider significant. The most serious of these involves lack of notice to a defendant that a penalty hearing will be held. There is no requirement that the defendant, at any stage of the proceeding prior to or during the hearing to determine his guilt or innocence, be notified that the death penalty will be requested. If the accused is not notified prior to trial that the State will ultimately seek the death sentence, and if he is not advised of the aggravating factor or factors upon which the State will rely, the accused and his counsel will be unable to make intelligent decisions with regard to his defense. Such fundamental questions as whether the accused should stand trial before a jury or the court, whether he should testify in his own behalf or whether he should, in fact, bargain for a plea of guilty, may well be dictated by the severity of the potential penalty.

It is argued that the accused will know during the *voir dire* examination of the jury whether or not the death penalty will be sought since a defendant is allowed 20 peremptory challenges in a capital case. (Ill. Rev. Stat. 1977, ch. 38, par. 115—4(e).) A capital case is one in which the death penalty may, but need not necessarily, be inflicted. (*People ex rel. Hemingway v. Elrod* (1975), 60 Ill. 2d 74.) Murder is a crime for which the death penalty may be inflicted. The fact that an accused is allowed 20 peremptory challeges is a very uncertain and unsatisfactory indicator of what penalty will be sought, considering that fundamental defense decisions must be based thereon.

For the reasons stated above, I would hold that section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)) is unconstitutional and that no valid sentencing hearing could be held thereunder.

In summary, that section confers upon the prosecutor, the executive branch of our government, the authority to exercise, interfere with and limit the sentencing function (a judicial power), in violation of article II, section 1, of the Illinois Constitution of 1970. I would also hold that section 9—1(d) violates the Federal Constitution eighth amendment requirements for the imposition of the death penalty as announced in the decisions of the Supreme Court cited herein. Also, I would hold that by failing to require that notice be given that the death penalty hearing will be requested, the statute denies to a defendant a fundamental element of due process.

GOLDENHERSH, C.J., and CLARK, J., join in this dissent.